PARFI HOLDING AB, Gunnar Gillberg, Plenteous Corp. and Grandsen, Ltd., Plaintiffs Below, Appellants,

v.

MIRROR IMAGE INTERNET, INC., Xcelera.Com, Inc., Alexander M. Vik, Gustav Vik and Hans Magnus Fajerson, Defendants Below, Appellees/Cross–Appellants.

No. 27, 2002.

Supreme Court of Delaware.

Submitted: Aug. 6, 2002.

Decided: Nov. 4, 2002.

Melanie K. Sharp, of Young, Conaway, Stargatt & Taylor, LLP, Wilmington; M. Frederick Pritzker, and James W. Stoll (argued), of Brown Rudnick Berlack Israels, LLP, Boston, MA, of counsel, for Appellants.

Jesse A. Finkelstein, and Thad J. Bracegirdle, of Richards, Layton & Finger, Wilmington; Peter J. Macdonald (argued), Robin L. Alperstein of Hale and Dorr, LLP, New York City, of Counsel, for Appellees.

Before VEASEY, Chief Justice, WALSH, HOLLAND and STEELE, Justices, and RIDGELY, President Judge, Superior Court,[1] constituting the Court en Banc.

---

1. Sitting by designation pursuant to Del. Const. art. IV, § 12.

VEASEY, Chief Justice.

■ In this appeal, we hold that contracting parties who provide for the arbitration of disputes in their agreements need submit to arbitration only those claims that touch on the legal rights created by their contract. The Court of Chancery dismissed fiduciary duty claims brought by minority stockholders of a Delaware corporation on the ground that the transactions giving rise to the stockholders' causes of action were also the factual basis for contract claims relating to the Underwriting Agreement through which they acquired their interests in the company. The Vice Chancellor reasoned that the arbitration clause the stockholders placed in their Underwriting Agreement required them to bring all of their claims relating to the transactions, including the fiduciary duty claims, before the arbitration tribunal.

■ We disagree with this holding because the fiduciary duty claims the minority stockholders asserted are not based on the rights and obligations created by the underlying agreement that required arbitration of claims "arising out of or in connection with" the agreement itself. When contracting parties provide for the arbitration of claims in their agreement, the arbitration provision, no matter how broadly drafted, can reach only the claims within the scope of the contract, and the fiduciary duty claims here are beyond that scope.

Accordingly, we reverse the judgment of the Court or Chancery dismissing the minority stockholders' claims and we remand the matter to the Court of Chancery for proceedings consistent with this opinion.

### Facts

Mirror Image Internet, Inc., is a Delaware corporation involved in designing hardware to speed information retrieval and transmission across the Internet. Mirror Image was formed in 1997 as a subsidiary of Mirror AB, a Swedish corporation.

As a struggling start-up enterprise, Mirror Image required frequent infusions of capital to stay operational. Mirror AB could not, on its own, meet the financing needs of its subsidiary. By 1999, Mirror AB had to seek outside investors who could provide enough funds so that Mirror Image could meet its short-term obligations and stave off bankruptcy.

Mirror Image found two investors. In March of 1999, Mirror Image entered into an agreement (the "Underwriting Agreement") with a corporation that is currently known as Xcelera Inc., and Plenteous Corp. Xcelera is a Cayman Islands Holding company. Plenteous is a Panamanian corporation. The Underwriting Agreement provided Mirror Image $2 million in capital, $1.75 million of which would be contributed by Xcelera and the balance provided by Plenteous. Once the Agreement closed, Xcelera became the controlling stockholder with a 62% interest in Mirror Image. Plenteous and two other stockholders, Grandsen, Ltd. and Gillberg,[2] who were Mirror AB stockholders, were given the right to participate in the offering. They provided the balance of the $2 million and became minority stockholders in the corporation along with Mirror AB. In addition to setting the price and quantity terms of the stock offering, the Agreement granted Xcelera and Plenteous the right to appoint directors to the Mirror Image board. Mirror AB retained the right to appoint one director. Finally, the parties agreed that any dispute, controversy or claim "arising out of or in connection with this Agreement, or the breach, termi-

---

**2.** Grandsen is a British corporation. Gillberg is an individual citizen of Sweden.

nation or invalidity thereof, shall be settled by arbitration" in Sweden.[3]

The relationship among the parties deteriorated quickly after the stock offering closed. After gaining control of the corporation, Xcelera initiated a series of transactions that it claims were designed to benefit Mirror Image. The minority stockholders believe Xcelera has benefitted only itself. Viewing these transactions as part of a scheme to dilute their minority interest, Mirror AB formed a litigation construct, Parfi Holding AB, which proceeded, along with Plenteous, Grandsen, and Gillberg, to challenge Xcelera's actions.[4]

The first two undertakings that raised concern for Parfi occurred in April and July of 1999. The transactions involved subscriptions totaling over 13 thousand shares of Mirror Image stock, ostensibly intended to raise $7 million that Mirror Image required to continue operations. Mirror Image issued all of the stock to Xcelera, boosting Xcelera's holdings from 62.5% to 91.8% of the corporation's equity. Parfi alleges that the subscriptions were unnecessary and designed solely to allow Xcelera to strengthen its hold on Mirror Image by purchasing the stock at a price below fair market value. Xcelera allegedly did not provide the minority stockholders sufficient time to decide whether to subscribe and ignored attempts by other stockholders who attempted to exercise their right to participate in the subscriptions.

In the third transaction, Xcelera allegedly used its control of the Mirror Image board to arrange for a private placement of Convertible Preferred Stock (the "Convertible Preferred Stock Offering" or "November Offering"). According to Parfi, the offering was designed to permit Xcelera to capitalize on the pending announcement that Hewlett–Packard would enter into a strategic alliance with Mirror Image. The strategic alliance involved a $32 million investment in the start-up by the computer giant. Parfi claims that the Convertible Preferred Offering allowed Xcelera to purchase Mirror Image stock at a pre-announcement bargain price before the market received the information and improved its stock price.

In the fourth transaction Parfi contends that Xcelera usurped a corporate opportunity that rightfully belonged to Mirror Image. In March of 2000, Exodus Communications Inc. entered into an agreement to buy over 32 million shares of Mirror Image stock (the "Exodus Transaction").[5] In exchange, Mirror Image would receive $75 million in cash and over 3 million shares of Exodus stock. Xcelera arranged for Exodus to pay 75% of the consideration directly to Xcelera since it owned the vast majority of Mirror Image stock. Xcelera has allegedly exchanged at an enormous profit its diluted stock for cash and Exodus stock.

Xcelera has profited greatly from its investment in Mirror Image. The price of Xcelera stock rose from approximately $29 per share in July of 1999 to $190 per share by February of 2000. Believing Xcelera has reaped this gain at the expense of its fellow Mirror Image investors, Parfi has sought relief based on its dual legal relationship with Xcelera. Parfi has brought a contract claim against Xcelera as a fellow

---

3. Underwriting Agreement § 20.2.

4. Plaintiffs will be referred to collectively as Parfi unless the analysis requires mentioning the specific parties by name.

5. By this time, Mirror Image had initiated two stock splits which increased the number of authorized shares to 96 million.

investor who made certain assurances in the Underwriting Agreement. Separately, Parfi asserts that, as a controlling stockholder, Xcelera has breached fiduciary duties owed to Parfi under Delaware corporation law.

### Arbitration Proceedings in Sweden

Abiding by the terms of the Underwriting Agreement, Parfi submitted its breach of contract claims to arbitration in Sweden. The contract claims Parfi presented at arbitration did not involve a breach of any specific provision of the Underwriting Agreement. Parfi sought to prove that Xcelera led its fellow underwriters to rely on certain assumptions that induced them to enter into the contract. According to Parfi, Xcelera assured its fellow underwriters that the Agreement provided only an interim solution to Mirror Image's financing problem and that Xcelera would, on behalf of the other investors, arrange for subsequent stock offerings at a much higher price. Xcelera, Parfi claimed, promised to use its controlling interest only to raise additional capital at a favorable rate of return and assured Parfi that the controlling interest would not be used to dilute its investment. Plenteous also submitted to the arbitrators an e-mail in which a Xcelera board member promised that Xcelera would seek Plenteous' consent before Mirror Image took any "corporate action." Parfi and Plenteous argued that Xcelera's conduct amounted to a failure of these assumptions which invalidated the Agreement and entitled the investors to damages for the resulting dilution of their investment.

Parfi did not base any of its arbitration claims on its status as a stockholder of Mirror Image. The arbitrators' decision specifically noted that:

> [V]arious corporate actions in [Mirror Image] after the Underwriting Agreement, undertaken under the laws of the State of Delaware, are presently subject to litigation before the courts of that State.... The claimants have ... not based their case in the present arbitration on or presented evidence regarding Delaware law. Also, they have not invoked the duties ... of Xcelera as majority shareholder.... [6]

The Arbitration Tribunal issued its decision on September 26, 2001. Parfi and Plenteous could not convince the Tribunal that Xcelera entered into the Underwriting Agreement with an intent to dilute the interests of the other investors. The Tribunal held that the Agreement was meant to provide a short-term investment in capital, and any long-term plan to secure financing was not a basic assumption upon which the Agreement was based.[7] The Tribunal awarded damages to Plenteous, however, because the arbitrators found that Plenteous' participation in the Agreement was based on Xcelera's assurance that it would seek Plenteous' consent before engaging Mirror Image in any "corporate action." [8] The Tribunal determined that the April and July subscriptions were "corporate actions," and the Tribunal awarded Plenteous damages for any resulting dilution in their interest in Mirror Image.[9]

### Proceedings in the Court of Chancery

In November of 2000, a few months after submitting its contract claims to arbitration, Parfi filed an action in the Court of Chancery alleging that Xcelera breached

---

6. Arb. Award at 25.

7. *Id.* at 26.

8. *Id.* at 28, 31.

9. *Id.*

fiduciary duties it owed to Mirror Image stockholders. Parfi alleged various claims of fraud, conspiracy, implied contract and misappropriation of a corporate opportunity against Xcelera and the Xcelera directors who sit on the Mirror Image board.

Xcelera responded with motions to dismiss based on lack of personal jurisdiction and failure to submit the fiduciary duty claims to mandatory arbitration as provided in the Underwriting Agreement. The Court of Chancery granted Xcelera's motion for summary judgment and dismissed Parfi's claims, holding that the broad arbitration clause in the Underwriting Agreement required Parfi to submit for arbitration all claims related to the series of transactions that were challenged in Sweden.[10] With respect to the central issue, the court held that the fiduciary duty claims were "in connection with" the Underwriting Agreement and were, therefore, mandatorily arbitrable thereunder.

In the alternative, the Vice Chancellor (1) dismissed Xcelera's motion to dismiss all counts against it for lack of personal jurisdiction; (2) denied Mirror Image's motion to dismiss plaintiffs' derivative claims; (3) granted defendants' motions to dismiss the fraud claims as well as the claims against the director defendants for aiding and abetting fraud for failure to state a claim upon which relief may be granted; (4) required the complaint be amended to change the derivative constructive fraud claims into counts for breach of fiduciary duty; (5) granted defendants' motions to dismiss the civil con-

spiracy claims; and (6) granted the defendants' motions to dismiss plaintiffs' breach of contract claim against Xcelera, as well as their motion to dismiss plaintiffs' tortious interference with contract claim against the director defendants.[11]

### Issues on Appeal

Parfi claims the Court of Chancery erred: (1) by dismissing its fiduciary duty claims as subject to arbitration because of the "arising out of or in connection with" language of the Underwriting Agreement; (2) by finding that two of the plaintiffs, Grandsen and Gillberg, were bound by the arbitration clause even though they did not sign the Agreement; and (3) by finding that the individual director defendants could seek the benefit of the arbitration clause even though they did not sign the Underwriting Agreement.[12] Accordingly, Parfi asks this Court to reverse the trial court's judgment and permit plaintiffs to proceed with their claims in the Court of Chancery. We need to reach only the first issue on appeal to resolve the matter before us.

### The Underwriting Agreement Does Not Require Parfi and Plenteous to Submit Their Fiduciary Duty Claims to Arbitration

■ This Court reviews de novo the Court of Chancery's interpretation of the Underwriting Agreement[13] as well as the application of relevant law.[14]

Parfi argues that the fiduciary duty claims it filed in the Court of Chancery were not "in connection with" the Under-

**10.** *Parfi Holding AB v. Mirror Image Internet, Inc.,* (*"Parfi S.J. Op."*), Del.Ch., C.A. No. 18507, 794 A.2d 1211, 1215 (2001).

**11.** *Id.* at 1215. These alternative decisions were predicated on the possibility that court's decision on arbitrability might not prevail.

**12.** The balance of the Vice Chancellor's decision has not been appealed and is not addressed by this Court.

**13.** *Schock v. Nash,* 732 A.2d 217, 224 (Del. 1999).

**14.** *Rapid–American Corp. v. Harris,* 603 A.2d 796, 804 (Del.1992).

writing Agreement and, therefore, these claims fall outside the mandatory arbitration provided for in Section 20.2 of the contract. Xcelera rests its counter-argument on the Vice Chancellor's interpretation of the arbitration clause as an obligation so broad in scope that it required Parfi to assert its fiduciary duty claims along with its contract claims.

■■■ When the arbitrability of a claim is disputed, the court is faced with two issues. First, the court must determine whether the arbitration clause is broad or narrow in scope. Second, the court must apply the relevant scope of the provision to the asserted legal claim to determine whether the claim falls within the scope of the contractual provisions that require arbitration. If the court is evaluating a narrow arbitration clause, it will ask if the cause of action pursued in court directly relates to a right in the contract. If the arbitration clause is broad in scope, the court will defer to arbitration on any issues that touch on contract rights or contract performance. This is a case of first impression in Delaware.[15]

### The Arbitration Clause in the Underwriting Agreement Establishes a Broad Scope

■■■ The parties do not dispute that Section 20.2 of the Underwriting Agreement has a broad scope. By agreeing to submit to arbitration "any dispute, controversy, or claim arising out of or in connection with" the Underwriting Agreement, Xcelera, Mirror AB, and Plenteous have signaled an intent to arbitrate all possible claims that touch on the rights set forth in their contract.[16] The issue is whether the arbitrable contract claims are connected to the fiduciary duty claims that are independently grounded on Delaware corporation law.

### The Fiduciary Duty Claims Are Beyond the Scope of the Arbitration Clause

The Vice Chancellor applied the arbitration clause to the fiduciary duty claims because he read the contract term to require "the resolution of claims related to a common set of underlying facts in a single forum."[17] We disagree with this interpretation of what Mirror AB, Plenteous, and Xcelera intended to provide for in their contract. The issue is whether the fiduciary duty claims implicate any of the rights and obligations provided for in the Underwriting Agreement. Stated differently, do the fiduciary duty claims depend on the existence of the Underwriting Agreement?

■■■ When parties to an agreement decide that they will submit their claims to arbitration, Delaware courts strive to honor the reasonable expectations of the par-

---

**15.** While Parfi's appeal presents this Court's first opportunity to articulate the approach for determining the arbitrabililty of claims, we note that courts in several other jurisdictions employ a similar inquiry. *See, e.g., Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth,* 723 F.2d 155, 159 (1st Cir.1983), *aff'd in part rev'd in part,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985); *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.,* 252 F.3d 218, 224 (2d Cir.2001); *American Recovery Corp. v. Computerized Thermal Imaging, Inc.,* 96 F.3d 88, 93 (4th Cir.1996); *Ford v. NYLCare Health Plans of the Gulf Coast, Inc.,* 141 F.3d 243, 250–51 (5th Cir. 1998) (interpreting Texas law); *In re Oil Spill by Amoco Cadiz,* 659 F.2d 789, 794 (7th Cir.

1981); *Simula, Inc. v. Autoliv, Inc.,* 175 F.3d 716, 720 (9th Cir.1999); *Coors Brewing Co. v. Molson Breweries,* 51 F.3d 1511, 1515–16 (10th Cir.1995); *Armada Coal Export, Inc. v. Interbulk, Ltd.,* 726 F.2d 1566, 1568 (11th Cir.1984); *Seifert v. U.S. Home Corp.,* 750 So.2d 633, 638 (Fla.1999).

**16.** *See Elf Atochem N. America v. Jaffari Inc.,* 727 A.2d 286, 295 (Del.1999) (holding that "in connection with" creates an obligation to submit claims related to the agreement to arbitration).

**17.** *Parfi S.J. Op.,* 794 A.2d at 1226.

ties and ordinarily resolve any doubt as to arbitrability in favor of arbitration.[18] Nevertheless, arbitration is a mechanism of dispute resolution created by contract.[19] An arbitration clause, no matter how broadly construed, can extend only so far as the series of obligations set forth in the underlying agreement.[20] Thus, arbitration clauses should be applied only to claims that bear on the duties and obligations under the Agreement.[21] The policy that favors alternate dispute resolution mechanisms, such as arbitration, does not trump basic principles of contract interpretation.

◼ When Xcelera, Mirror AB, and Plenteous agreed to the arbitration provision in the Underwriting Agreement they

did not commit to bring into arbitration every possible breach of duty that could occur between the parties.[22] The arbitration clause signals only an intent to arbitrate matters that touch on the rights and performance related to the contract.[23] The term "arising out of or in connection with" must be considered in that light. The Court of Chancery should have concentrated on the similarity of the separate *rights* pursued by plaintiffs under both the contract and the independent fiduciary duties rather than the similarity of the *conduct* that led to potential claims for both the contract and fiduciary breaches of duty.[24]

Parfi can maintain an action based on the alleged breaches of the independent

---

**18.** *SBC Interactive, Inc. v. Corporate Media Partners*, 714 A.2d 758, 761 (Del.1998).

**19.** *See id.* at 761 (stating that "A court will not compel a party to arbitrate ... absent a clear expression of such an intent").

**20.** *See Coors*, 51 F.3d at 1516 ("A dispute within the scope of the contract is still a condition precedent to ... involuntary arbitration") (citation omitted); *see also NYLCare Health Plans*, 141 F.3d at 250 (stating that a claim "is arbitrable if it is 'so interwoven with the contract that it could not stand alone, but is not arbitrable if it is completely independent of the contract and could be maintained without reference to a contract'") (quoting *X.L. Ins. Co. Ltd v. Harford Accident & Indem. Co.*, 918 S.W.2d 687, 689 (Tex.App.1996)).

**21.** *Elf Atochem*, 727 A.2d at 295 (upholding trial court's determination that contract claims must be submitted to arbitration because they "bear directly" on the duties and obligations under the agreement).

**22.** The United States Court of Appeals for the Tenth Circuit provides a simple illustration of this principle: "[i]f two small business owners execute a sales contract including a general arbitration clause, and one assaults the other, we would think it elementary that the sales contract did not require the victim to arbitrate the tort claim because the tort claim is not related to the sales contract.... it is

simply fortuitous that the parties happened to have a contractual relationship." *Coors*, 51 F.3d at 1516.

**23.** *See, e.g., Blystad*, 252 F.3d at 224 (stating that broad arbitration clauses create a presumption of arbitrability for collateral matters which implicate "issues of contract construction or the parties' rights and obligations under it") (quotation omitted); *American Recovery*, 96 F.3d at 93 (agreement must "encompass the dispute" to require arbitration).

**24.** Generally, purportedly independent actions do not touch matters implicated in a contract if the independent cause of action could be brought had the parties not signed a contract. Thus, a physician can bring a class action suit on behalf of patients against an HMO for false advertising claims even though the physician signed a contract to provide care to beneficiaries under the HMO. *NYLCare Health Plans*, 141 F.3d at 250–52. Although the physician may rely on information disclosed to him through his agreement with the HMO, the obligations under the contract are not related to the separate duties the HMO owed potential patients under tort law. *Id.* at 251–52. Similarly, a brewing company could not be forced to submit to mandatory arbitration when it brings an antitrust claim against another brewing company simply because they are involved in a licensing agreement. *Coors*, 51 F.3d at 1515–1518. If the

set of fiduciary duties that Xcelera owes Mirror Image stockholders even though the claims arise from some or all of the same facts that relate to the transactions that provided the basis for its contract claims.[25] Xcelera's fiduciary duties to Mirror Image consist of a set of rights and obligations that are independent of any contract[26] and need be submitted to arbitration only if the claims based on fiduciary duties touch on the obligations created in the Underwriting Agreement.[27] If the Underwriting Agreement does not implicate Xcelera's fiduciary duties, the arbitration clause cannot bar Parfi from seeking the relief every other stockholder is entitled to under Delaware law.

The Vice Chancellor painstakingly parsed the contractual language requiring that claims "arising out of or in connection with" the Underwriting Agreement must be submitted to arbitration.[28] He properly held that the fiduciary duty claims do not "arise out of the" Agreement. But he concluded, we believe erroneously, that these claims are "in connection with" the Agreement. In our view, this latter conclusion gives a far too expansive a meaning

to the word "connection." We conclude that the analysis must turn on the issue of whether the fiduciary duty claims would be assertable had there been no Underwriting Agreement. We hold that they would be independently and separately assertable in that situation and are therefore not "in connection with" the Agreement.

The Underwriting Agreement does not establish rights and obligations extensive enough to encompass the dispute Parfi has brought in the Court of Chancery. The purpose of this Underwriting Agreement, like similar underwriting agreements, was to "negotiate the amount of capital that the company [sought] ... to raise, the type of security to be issued, the price and any special features of the security, and the underwriter's compensation."[29] The Agreement set out the typical warranties related to compliance with securities laws and other regulations. In addition, Mirror Image bargained for maintaining one seat on the board of directors, and Xcelera and Plenteous were entitled to appoint directors to the board. The performance of the Agreement, by its terms, was sched-

court applied the arbitration clause to a set of rights against unfair competition that existed outside the agreement, *"every brewer in America* except" the party to the contract could bring the antitrust action. *Id.* at 1516.

**25.** *See Havens v. Attar,* 1997 WL 55957 (Del. Ch.) at *5 (holding that if an agreement is merely a "source of information that the Court may find useful in its analysis of the plaintiffs' claims" then the agreement does not require arbitration of the claim); *see also NYLCare Health Plans,* 141 F.3d at 251 ("The fact that the complaint specifically referred to, and related as a factual matter to, the contract containing the arbitration clause [is] ... irrelevant.") (analyzing *Fridl v. Cook,* 908 S.W.2d 507, 513 (Tex.App.1995)).

**26.** *See* BALOTTI & FINKELSTEIN, DELAWARE LAW OF CORPORATIONS AND BUSINESS ORGANIZATIONS, Forward (2002) ("In corporations, the basic con-

tract among stockholders is contained in the certificate of incorporation and to some extent the by-laws").

**27.** *Compare American Recovery,* 96 F.3d at 94 (requiring arbitration of a corporate opportunity claim because the duty of loyalty breach was based upon a business expectancy created by the underlying agreement), *with Havens* at *1, *5 (holding that a corporate opportunity does not fall under the arbitration clause of a voting agreement because the claim involved usurpation of a business prospect that did not "turn on" a contract that merely governs voting rights and dividend distributions among stockholders).

**28.** *Parfi S.J. Op.,* 794 A.2d at 1227.

**29.** *MDCM Holdings, Inc. v. Credit Suisse First Boston Corp.,* 216 F.Supp.2d 251, 253 (S.D.N.Y.).

uled to conclude on the closing date, when the underwriters and the company committed to a schedule for issuing the securities and paying the stated price per share.[30]

Reviewing the provisions of the Agreement, Xcelera cannot point to any contract term that creates a species of obligation upon which Parfi can base a breach of fiduciary duty claim. The Tribunal evaluating the Agreement noted that:

> In the understanding of the Tribunal, the distinction between fair and unfair dilution can absent express agreement be drawn only with reference to applicable company law. It can be said that any agreement resulting in some *lasting* relation between the parties thereto is premised on the assumption that the other party or parties will in the future behave within the limits of the law. Such assumption does not, however, trigger legal remedies different from those which follow from the application of the relevant law. . . . it is accordingly for the Courts of the State of Delaware to determine whether there was "unfair" dilution . . . . [31]

The Tribunal has interpreted the Underwriting Agreement to fall short of imposing any continuing duty on the part of Xcelera to safeguard the minority stockholders' investment against dilution. The purported dilution rests on an alleged breach of duty that is more "lasting" than the short-lived obligations bargained for in the Underwriting Agreement. The fiduciary duties Xcelera owes Parfi are beyond the contract and rest on an independent set of rights provided for in the Delaware corporation law.

Even though we have determined that fiduciary duty claims lay outside the scope of the Underwriting Agreement, we have nevertheless given the arbitration clause its full effect. The Vice Chancellor incorrectly assumed that "if other claims based on the same conduct that is also alleged to be a breach of . . . the Agreement are not 'in connection with' a breach or the invalidity of the Agreement," then no other non-contract claims could be "so 'connected.' " [32] The court need only look to the Tribunal's decision to see that the arbitrators relied upon claims arising "in connection with" the Underwriting Agreement to award Plenteous damages. The Tribunal found that Xcelera breached an obligation to obtain Plenteous' consent before it entered into the stock subscriptions. The consent obligation was a collateral agreement between Plenteous and Xcelera that did not "arise" from the rights in the Underwriting Agreement. The Tribunal noted that collateral agreement "was . . . no part of the Underwriting Agreement . . . but a separate promise from one of the underwriters to another." [33] The side agreement between the underwriters could have been arbitrated only because the obligation arose "in connection with" the Agreement.

By comparing the side agreement between the underwriters with the fiduciary duty claim, obvious differences in the scope and the nature of the obligations prove that the side agreement is a collateral matter to the Underwriting Agreement while the unfair dilution claims and the corporate opportunity claims are not. The side agreement was confined to only two parties, Xcelera and Plenteous.[34] Xcel-

**30.** Underwriting Agreement §§ 1.1, 4.1–4.4.

**31.** Arb. Award at 29 (emphasis supplied).

**32.** *Parfi S.J. Op.* at 1227.

**33.** Arb. Award at 30.

**34.** The Tribunal denied Mirror AB the benefit of Plenteous' right to consent because Mirror AB did not know about the e-mail. Since

era's fiduciary duties as a controlling stockholder, by contrast, are owed to all Mirror Image stockholders.[35] Plenteous cannot claim a right to consent unless it bargained for such a right. The right to protection against a controlling stockholder, however, applies automatically when a party becomes a Mirror Image stockholder.[36] The consent Plenteous bargained for was confined to "corporate actions" taken by Xcelera through Mirror Image.[37] An unfair dilution claim and corporate opportunity claim would encompass all transactions initiated by Xcelera that prove a breach of Xcelera's fiduciary duty.[38]

▬ Applying the arbitration clause to bar Parfi's action would lead to an absurd outcome: every stockholder except Parfi could bring the unfair dilution claim. The Vice Chancellor acknowledged this result but concluded that Parfi chose its predicament by basing a contract claim on the conduct that could have provided a strong-

er fiduciary duty claim.[39] We disagree because the mandatory arbitration clause in the Agreement applies only to the rights relating to the initial offering of Mirror Image stock. The parties likely did not intend the provision to act as a bar to litigation over a set of rights and remedies that lay outside the scope of the Agreement itself.

The Vice Chancellor correctly engaged in an analysis to scrutinize causes of action carefully to search out artfully pleaded claims that attempt to avoid the arbitration clause to which the plaintiffs have agreed.[40] But plaintiffs must split different claims that arise from the same transaction if some of those claims are based on rights that cannot be adjudicated by an arbitrator, like the Tribunal here, who can grant relief based only on the limited set of duties created by a particular agreement.[41] While some agreements, by their

"the promise in the e-mail was not given to Mirror AB, this company cannot obtain damages on this ground." Arb. Award at 31.

**35.** *Kahn v. Lynch Communication Sys. Inc.*, 638 A.2d 1110, 1114 (Del.1994) (holding that a stockholder who owns a majority interest in or exercises control over the business affairs of the corporation owes fiduciary duties to its fellow stockholders).

**36.** *See id.; see also* Del. Ch. R. Pr. 23.1 (plaintiff may initiate a derivative action if the plaintiff was a stockholder of the corporation at the time of the transaction complained of or if the plaintiff's interest in the corporation "devolved on the plaintiff by operation of law").

**37.** The Tribunal held that the definition of "corporate action" only reached the stock subscriptions. The November Offering and the Exodus Transaction did not fall within the side agreement because Plenteous could not demonstrate that those transactions "fall under the concept of corporate action between" Xcelera and Mirror Image. Arb. Award at 32.

**38.** A stockholder may bring a corporate opportunity claim, for example, by alleging that

a fiduciary has saved for himself an opportunity in which the corporation has an expectancy, that is in the corporation's line of business, and is a prospect that the corporation is financially able to exploit. *See Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 155 (Del. 1996). The fiduciary need not act through the company to breach his duty of loyalty.

**39.** *Parfi S.J. Op.* 794 A.2d at 1228.

**40.** *See Elf Atochem,* 727 A.2d at 296 (noting plaintiffs cannot couch their contract claims as derivative actions to avoid their obligation to arbitrate disputes related to the agreement).

**41.** *Cf. Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 217, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) (rejecting notion that judicial economy requires a court to hear an arbitrable claim along with a non arbitrable claim and permitting the arbitration and the federal action to provide in seperate forums). Courts commonly split arbitrable claims from non-arbitrable claims. *See, e.g., Mediterranean Enterprises Inc. v. Ssangyong Corp.,* 708 F.2d 1458, 1464 (9th Cir.1983); *Gregory v. Electro–Mechanical Corp.,* 83 F.3d 382, 385–86 (11th Cir.1996); *American Recovery,* 96 F.3d at 91.

nature, extend so far as to mandate arbitration for breach of fiduciary duty claims,[42] the Underwriting Agreement here did not. The right to vindicate breaches of fiduciary duty inflicted by a majority stockholder on the minority is a central doctrine of Delaware law.[43] Absent a clear expression of an intent to arbitrate breach of fiduciary duty claims, Parfi has the right to have the merits of those claims adjudicated by the Court of Chancery.[44]

### Conclusion

We reverse the judgment of the Court of Chancery dismissing the complaint and we remand to the court for proceedings consistent with this opinion.

**42.** *See, e.g., Elf Atochem,* 727 A.2d at 288, 293–95 (requiring parties to submit purported fiduciary duty claims to arbitration since the series of agreements created a system setting forth the governance and operation of the parties' joint venture).

**43.** *See, e.g., Sterling v. Mayflower Hotel Corp.,* 93 A.2d 107, 109–10 (Del.1952) (noting that, as a "settled rule of law," a majority stockholder stands in the position of a fiduciary in relation to the property of the minority stockholders).

**44.** *See, e.g., DMS Properties–First v. Scott Associates,* 748 A.2d 389, 391 (Del.2000) ("A party cannot be forced to arbitrate the merits

of a dispute ... in the absence of a clear expression of such intent in a valid agreement."). We need not decide whether or to what extent a properly drafted agreement can compel arbitration of fiduciary duty claims, as that issue is not before us, and we decide only the case before us. *See Paramount Communications, Inc. v. QVC Network, Inc.,* 637 A.2d 34, 51 (Del.1993).