# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

CHRISTOPHER F. QUINLAN,　)
　)
　　　　Plaintiff,　)
　)
　　v.　)
　) C.A. No: N24C-11-124 KMM
　)
MATHEW M. O'BRIEN, M.D.,　)
BRANDYWINE HUNDRED FAMILY　)
MEDICINE, LLC, and MDVIP, LLC,　)
　)
　　　　Defendants.　)

Submitted: November 5, 2025
Decided: January 13, 2026

## MEMORANDUM OPINION AND ORDER

*MDVIP'S Motion to Dismiss* – GRANTED

Gilbert F. Shelsby, Jr., John M Spadaro (argued), Shelsby & Leoni, P.A., Wilmington Delaware, *attorneys for Plaintiff*.

David E. Wilks, D. Charles Vavala, III, Wilks Law LLC, Wilmington, Delaware; Mathew Zimmerman (argued), Kristin Royal, Holland & Knight LLP, Orlando, Florida, *attorneys for Defendant MDVIP, LLC*.

**Miller, J.**

# I. INTRODUCTION

Plaintiff Christopher Quinlan ("Quinlan") brought three causes of action—medical negligence, breach of contract, and fraudulent inducement—against Defendants Mathew M. O'Brien, M.D. ("Dr. O'Brien"), Brandywine Hundred Family Medicine, LLC, and MDVIP, LLC ("MDVIP").

At issue here is MDVIP's motion to dismiss (the "Motion"), which seeks to dismiss all claims asserted against it under Rule 12(b)(1), or in the alternative Rule 12(b)(6). MDVIP argues that the Court lacks subject matter jurisdiction over the claims asserted against it because they are subject to a valid arbitration agreement entered into between Quinlan and MDVIP. The parties' arbitration agreement clearly and unmistakably delegates the question of arbitrability to the arbitrator and was validly formed. Thus, as a threshold matter, it is for the arbitrator to determine the scope of the arbitration agreement and whether Quinlan's claims fall within it. Accordingly, MDVIP's Motion pursuant to Rule 12(b)(1) is **GRANTED**.

Because the arbitrator must first decide the arbitrability of Quinlan's claims, the Court does not reach the merits of MDVIP's alternative arguments under Rule12(b)(6).

## II.     FACTUAL BACKGROUND[1]

### A.     *MDVIP'S business*

MDVIP is a medical concierge service.[2]   For a fee, MDVIP provides its members access to affiliated physicians who, in turn, provide medical care.  The agreement between MDVIP and its members is memorialized in a membership agreement (the "Membership Agreement").[3]  Through the Membership Agreement, members contract to receive MDVIP's wellness program (the "Wellness Program").[4]  The Wellness Program is comprised of a suite of healthcare related services provided by membership in MDVIP and conducted by the affiliated physician.  Included within the Wellness Program are advanced wellness screenings, diagnostics and wellness plans, and a personal health record.[5]

### B.     *Quinlan becomes a member of MDVIP and is treated by Dr. O'Brien.*

In April 2019, Quinlan became a member of MDVIP and began receiving medical care from Dr. O'Brien, a MDVIP affiliated physician.[6]  MDVIP advertised Dr. O'Brien as a healthcare professional who, through the Wellness Program, provides comprehensive healthcare services.[7]

---

[1] The following facts are derived from Plaintiff's Amended Complaint. D.I. 35 ("Am. Compl.") and the documents incorporated by reference.
[2] Am. Compl. ¶ 14.
[3] *See id.* ¶ 13; D.I. 40, Ex. B ("Membership Agreement").
[4] Membership Agreement § 1.
[5] *Id.*
[6] Am. Compl. ¶¶ 9, 13.
[7] *Id.* ¶ 15.

Dr. O'Brien treated Quinlan's various medical conditions, including diabetes and hypertension, prescribed medications, and documented Quinlan's symptoms.[8] Quinlan informed Dr. O'Brien that he had been experiencing "numb feet, excessive thirst and urination."[9] As indicated by his medical history and symptoms, Quinlan was at an increased risk of kidney disease.[10] Dr. O'Brien, however, never ordered diagnostic testing or made any evaluation of Quinlan's kidney function.[11]

While under the care of Dr. O'Brien, Quinlan developed stage IV kidney failure.[12] He requires dialysis treatment three times a week and is currently awaiting a kidney transplant.[13]

## C.   *The Membership Agreement*

The Membership Agreement defined the relationship between Quinlan and MDVIP. It explained the services encompassed within the Wellness Program and detailed the role of the affiliated physician and the affiliated physician's relationship to MDVIP—defining the affiliated physician as an independent contractor with no oversight from MDVIP.[14]

---

[8] *Id.* ¶¶ 9–11.
[9] *Id.* ¶ 10.
[10] *Id.* ¶ 12.
[11] *Id.* ¶ 12.
[12] *Id.* ¶ 16.
[13] *Id.* ¶ 17.
[14] Membership Agreement § 2–3.

The Membership Agreement also contained an arbitration provision (the "Arbitration Provision") that provided, in part:

**Arbitration is more informal than a lawsuit in court, uses a neutral arbitrator instead of a judge or jury, and has limited discovery. Arbitration is also final and binding and subject to only very limited review.**

Any past, present, or future claim, dispute involving MDVIP arising out of or relating to the [Wellness] Program and/or [the Membership Agreement] including the validity, breach, interpretation, formation, arbitrability, inducement, or enforcement thereof shall be resolved exclusively through binding Arbitration before a neutral arbitrator in the county where [Quinlan] resides. Each party will reasonably participate in the process of choosing the neutral arbitrator, who shall have the exclusive authority to resolve any claim(s) between the parties under any legal theory, whether based in contract, statute, tort, fraud, etc. Arbitration shall be conducted through Judicial Arbitration & Mediation Services ("JAMS"), or another arbitrator if not arbitrable through JAMS. JAMS rules in effect at the time of filing, including its Expedited Procedures, will apply to the Arbitration[.]

**THE PARTIES FULLY UNDERSTAND THAT THEY ARE INTENTIONALLY AND VOLUNTARILY WAIVING THEIR RIGHT TO (1) GO TO COURT; (2) HAVE A TRIAL BY JURY; AND (3) PARTICIPATE IN A CLASS ACTION.**[15]

---

[15] *Id.* § 9 (emphasis original).

**D.** *Procedural history*

Plaintiff, after initially filing a complaint, filed the Amended Complaint asserting claims of medical negligence (Count I),[16] breach of contract (Count II),[17] and fraudulent inducement (Count III).[18]

MDVIP responded with the Motion seeking to dismiss all claims against it.[19] The remaining defendants do not oppose the Motion.

## III. THE PARTIES' CONTENTIONS

MDVIP asserts that Quinlan's claims are subject to the Arbitration Provision, thus the Court lacks subject matter jurisdiction.[20]

Plaintiff responds on three fronts. First, that the Arbitration Provision is unenforceable because the arbitrator is unavailable.[21] Second, the Arbitration Provision is indefinite, ambiguous, and thus does not reflect a meeting of the minds.[22] And third, that the Arbitration Provision's scope does not cover his medical negligence claim against MDVIP.[23]

---

[16] Am. Compl. ¶¶ 19–23.
[17] *Id.* ¶¶ 24–26.
[18] *Id.* ¶¶ 27–31.
[19] D.I. 40 ("Mot.").
[20] *See generally* Mot.
[21] D.I. 43 (Plaintiff's Answering Brief ("AB")) at 14–15.
[22] *Id.* at 15–17.
[23] *Id.* at 17–19.

## IV. STANDARD OF REVIEW

A party may move to dismiss a complaint under Rule 12(b)(1) for lack of subject matter jurisdiction. The scope of Rule 12(b)(1) is flexible. It is often used as the mechanism to seek dismissal when the court actually has subject matter jurisdiction over the dispute, but the parties contractually agreed to submit their dispute to an alternative dispute resolution forum.[24] In this circumstance, the question is not whether the court lacks jurisdiction, but rather, whether it should decline to exercise the jurisdiction it otherwise has.[25]

Under Superior Court Civil Rule 12(b)(1), "[t]he Court 'need not accept the plaintiff's factual allegations as true and is free to consider facts not alleged in the complaint.'"[26] The plaintiff bears the burden to prove jurisdiction exists.[27]

---

[24] *Gandhi-Kapoor v. Hone Capital LLC*, 307 A.3d 328, 340-45 (Del. Ch. 2023) ("a motion to dismiss in favor of arbitration does not deprive a court of subject matter jurisdiction; it asks the court to enforce the parties' agreement to arbitrate and abstain from exercising jurisdiction that the court otherwise would have.").

[25] *Id.; Buzzfeed Media Enterprises, Inc. v. Anderson*, 2024 WL 2187054, at *4 (Del. Ch. May 15, 2024) ("Rule 12(b)(1) is a suitable vehicle for raising…arguments about why a court should not exercise its jurisdiction, and such a motion will be granted where it appears that as a matter of established doctrine the Court should not exercise its jurisdiction.") (internal citations and quotations marks omitted).

[26] *In re Proton Pump Inhibitors Products Liab. Litig.*, 2023 WL 5165406, at *5 (Del. Super. Aug. 11, 2023) (quoting *Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1284 n.14 (Del. 2007)) (cleaned up).

[27] *In re Proton Pump*, 2023 WL 5165406, at *5 (quoting *Appriva S'holder Litig.*, 937 A.2d at n.14).

## V.   DISCUSSION

### A.   *Delaware and arbitration agreements*

"Delaware is a contractarian state that holds parties' freedom of contract in high regard."[28]   Accordingly, "Delaware courts respect contractual agreements to arbitrate even in cases where sovereign authority grants the court the right to hear a case."[29]   Thus, if a claim falls within an arbitration clause of the parties' contract, Delaware courts decline to exercise subject matter jurisdiction over it.[30] "Delaware's public policy has a strong presumption in favor of arbitration[,]"[31] however, the policy is merely an acknowledgement that arbitration provisions are as enforceable as other contracts, but no more so.[32]   Indeed, "[t]he policy that favors alternate dispute resolution mechanisms, such as arbitration, does not trump basic principles of contract interpretation."[33]

To determine whether an arbitration agreement "deprives" a court of subject matter jurisdiction, the court must first determine who will decide the question of

---

[28] *Sunder Energy LLC v. Jackson*, 332 A.3d 472, 487 (Del. 2024).
[29] *Channel PES Acquisition Co., LLC v. Heritage-Crystal Clean, Inc.*, 2024 WL 3252166, at *8 (Del. Super. June 30, 2024).
[30] *See id.*
[31] *Donofrio v. Peninsula Healthcare Servs., LLC*, 2022 WL 1054969, at *2 (Del. Super. Apr. 8, 2022).
[32] *Gandhi-Kapoor* 307 A.3d at 347 (discussing *Morgan v. Sundance, Inc.*, 596 U.S. 411 (2022), which explains that the policy derived from some federal courts refusing to enforce arbitration agreements and that it exists "to make arbitration agreements as enforceable as other contracts, but not more so.").
[33] *Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 156 (Del. 2002); *Bunting Macks LLC v. D.R. Horton, Inc.-New Jersey*, 2025 WL 2233619, at *4 (Del. Ch. Aug. 6, 2025).

arbitrability.[34]  If the court is tasked with making the determination of arbitrability, the court must then engage in a two-step inquiry.[35]  First, "whether a valid binding arbitration agreement exists."[36]  Second, "whether Plaintiff's claim falls within the scope of the arbitration agreement."[37]  If, however, the question of arbitrability has been delegated to the arbitrator, the court's jurisdiction is limited to the first inquiry.[38]

**B.**     ***The Membership Agreement delegates arbitrability to the arbitrator.***

"In determining whether a claim is subject to arbitration, the court must distinguish between issues of substantive arbitrability and procedural arbitrability."[39]  Substantive arbitrability relates to the scope of an arbitration provision and whether the subject matter of a given dispute falls within it.[40]

---

[34] *Donofrio*, 2022 WL 1054969, at *3; *see also Medicis Pharmaceutical Corp. v. Anacor Pharmaceuticals, Inc.*, 2013 WL 4509652, at *3 (Del. Ch. Aug. 12, 2013).

[35] *Donofrio,* 2022 WL 1054969, at *2.

[36] *Id.* at *3.

[37] *Id.*

[38] *See Payne v. Samsung Electronics America, Inc.*, 2024 WL 726907, at *3 (Del. Super. Feb. 21, 2024); *see, e.g., Fairstead Cap. Mgmt. LLC v. Blodgett*, 288 A.3d 729, 753 (Del. Ch. 2023) ("[A] court must address issues of contract formation before deferring to an arbitrator to resolve [arbitrability.]"); *Marketwise, LLC v. Arnold*, 2025 WL 2092951, at *6 (Del. Ch. 2025) (explaining that after a finding of delegation of arbitrability to the arbitrator, a court's is limited to finding the existence of an arbitration clause); *Henry Schein, Inc. v. Archer and White Sales, Inc.*, 586 U.S. 63, 69 (2019) ("To be sure before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists.  But if a valid arbitration agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue.").

[39] *Viacom Intern., Inc. v. Winshall*, 2012 WL 3249620, at *12 (Del. Ch. Aug. 9, 2012), *aff'd*, 72 A.3d 78 (Del. 2013).

[40] *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 79 (Del. 2006).

Presumptively, courts decide issues of substantive arbitrability.[41] "Procedural arbitrability encompasses questions about compliance with procedural aspects of the arbitration agreement, including whether prerequisites such as time limits, notice, and other conditions precedent to an obligation to arbitrate have been met."[42] "Arbitrators presumptively decide questions of procedural arbitrability."[43]

### 1. *Issues of substantive arbitrability*

The question of whether parties agreed to arbitrate a particular dispute is generally one for the courts to decide.[44] Thus, Delaware courts decide issues of substantive arbitrability, "unless the parties clearly and unmistakably provide otherwise."[45] "The clear and unmistakable standard can be satisfied by an express agreement that substantive arbitrability will be determined by the arbitrator."[46]

Here, the Arbitration Provision provides that "any…claim, dispute, or controversy involving MDVIP arising out of or relating to the [Wellness] Program and/or the [Membership] Agreement including the…*arbitrability*… thereof, shall be

---

[41] *Id.*; *Gandhi-Kapoor*, 307 A.3d at 348 ("Substantive arbitrability encompasses gateway issues that are for a court to decide, such as the scope, validity, and enforceability of an arbitration agreement, whether it encompasses the controversy in question, and 'whether the parties are bound by a given arbitration clause.'") (citations omitted).
[42] *Archkey Intermediate Holding, Inc. v. Mona*, 302 A.3d 975, 992–93 (Del. Ch. 2023).
[43] *Id.* at 993.
[44] *Donofrio*, 2022 WL 1054969, at *3.
[45] *Willie Gary, LLC*, 906 A.2d 76, 79 (cleaned up).
[46] *Donofrio*, *LLC*, 2022 WL 1054969, at *3.

resolved exclusively through binding Arbitration[.]"[47]  This language is clear and unmistakable—the arbitrator decides issues of substantive arbitrability.

Quinlan argues that the Arbitration Provision does not apply to his medical negligence claim against MDVIP because that claim arises out of MDVIP's status as a medical care provider and its vicarious liability as a result of the alleged master-servant relationship between MDVIP and Dr. O'Brien, not Quinlan's contractual relationship with MDVIP.[48]  Therefore, he does not have a contractual duty to arbitrate that claim.[49]

Quinlan relies heavily on *Parfi Holding AB v. Mirror Image Internet, Inc.*[50]to support his argument.  In *Parfi*, the parties entered into an Underwriting Agreement which required the parties to submit any dispute "arising out of or in connection with" the agreement to arbitration in Sweden.[51]  Disputes arose and Parfi submitted its breach of contract claims to arbitration in Sweden.  Parfi also filed an action in the Court of Chancery for breach of fiduciary duties.  The lower court dismissed the action, finding that the fiduciary duty claims were subject to arbitration.

In deciding the scope of the arbitration, the Supreme Court ruled that the lower court should have focused on the similarity (or dissimilarity) of the *rights* Parfi was

---

[47] Membership Agreement § 9 (emphasis added).
[48] AB at 17–19.
[49] *Id.*
[50] 817 A.2d 149, 155 (Del. 2002).
[51] *Id.* at 151–52.

pursuing under the contract and the independent fiduciary duties.[52] The court provided guidance on how a trial court should analyze whether the various claims fall within the scope of the arbitration agreement or arise from independent duties.[53] The Supreme Court reversed the lower court and ruled that Parfi's breach of fiduciary duty claims did not fall within the "arising out of or in connection with" provision in the Underwriting Agreement and therefore, these claims were not subject to arbitration.[54]

Quinlan is correct that a party "need submit only those claims that touch the legal rights created by contract."[55] But as the *Parfi* court recognized, whether a claim is one that arises out of a common law duty outside the scope of the parties' arbitration agreement is a dispute over substantive arbitrability.[56] Here, the Membership Agreement is clear: the arbitrator decides disputes over substantive arbitrability, *i.e.* whether Quinlan's claims fall within the Arbitration Provision's scope, the Court cannot. The *Parfi* Underwriting Agreement did not delegate substantive arbitrability to the arbitrator. Thus, *Parfi* is distinguishable and does not provide Quinlan relief from the Arbitration Provision.

---

[52] *Id.* at 156.
[53] *Id.* at 156–57.
[54] *Id.* at 158–59.
[55] *Id.* at 151.
[56] *See id.* at 155.

## 2.     *Issues of procedural arbitrability*

Disputes over procedural prerequisites necessary to be complied with before seeking arbitration are for the arbitrator to decide.[57]   This is so because "parties to an arbitration contract would normally expect a forum-based decisionmaker to decide forum-specific procedural gateway matters."[58]

Here, Quinlan argues that the JAMS forum is unavailable because the Arbitration Provision fails to comply with JAMS's "Minimum Standards of Procedural Fairness."[59]   Pursuant to those standards, JAMS will not make itself available as a forum unless the applicable arbitration agreement "allow[s] for the discovery or exchange of non-privileged information relevant to the dispute."[60] Under Quinlan's view, the Arbitration Provision fails to do so because it allows only "limited discovery."[61]

The issue of whether the Arbitration Provision complies with JAMS's requirement of "Procedural Fairness" is a procedural question, presumptively within the province of the arbitrator—who has a greater understanding of JAMS's standards and their application to the parties' agreement.[62]   Quinlan has not offered any

---

[57] *Viacom Intern., Inc v. Winshall*, 72 A.3d 78, 82–83 (Del. 2013).
[58] *Howsam v. Dean Witter Reynolds, Inc.* 573 U.S. 79, 86 (2002).
[59] AB at 14–15.
[60] *Id.* at 15.
[61] *Id.*
[62] *See Howsam*, 537 U.S. at 86 (finding that the applicability of an arbitration forum's time limit rule "is a matter presumptively for the arbitrator not for the judge.").

argument that would rebut this presumption. In fact, as explained above, the Arbitration Provision delegates all disputes over arbitrability to the arbitrator. Accordingly, the Court lacks jurisdiction over Quinlan's procedural dispute.

**C.    *The Membership Agreement contains a valid arbitration agreement.***

Having determined that the arbitrator determines all issues of arbitrability, the Court is left with the limited jurisdiction of determining whether a valid arbitration agreement exists.[63] "The arbitrator cannot rule on the existence of the arbitration agreement that gives rises to the arbitrator's authority. A court must therefore always address challenges to the existence of the arbitration agreement."[64] Quinlan challenges the existence of the Arbitration Provision, arguing that it fails to reflect a meeting of the minds because it is ambiguous and indefinite.

"In determining whether an agreement to arbitrate exists, ordinary state-law contract principles apply."[65] "Under Delaware law, contract formation requires mutual assent, meaning a complete meeting of the minds of the parties."[66] "And, "where the putative contract is in the form of a signed writing, that document offers the most powerful evidence of a parties' intent to be bound."[67] "When interpreting

---

[63] *See Buzzfeed*, 2024 WL 2187054, at *12–14 (refusing to exercise jurisdiction over arguments that did not go to the existence of an arbitration agreement after finding the arbitrator decides arbitrability).

[64] *Gandhi-Kapoor*, 307 A.3d at 356; *see also Fairstead Cap. Mgmt., LLC*, 288 A.3d at 735 ("Issues of contract formation cannot be delegated to an arbitrator; they are always for the court.").

[65] *Skinner v. Peninsula Healthcare Servs.*, 2021 WL 778324, at *3 (Del. Super. Mar. 1, 2021).

[66] *Alexander v. Lyft, Inc.*, 2025 WL 689696, at * 2 (Del. Super. Mar. 4, 2025).

[67] *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1230 (Del. 2018).

a contract, Delaware courts read the agreement as a whole and enforce the plain meaning of clear and unambiguous language."[68] "Language is ambiguous if it is susceptible to more than one reasonable interpretation."[69] However, contract language is not ambiguous merely because a party disputes what it means.[70]

Here, Quinlan does not dispute that he signed the Membership Agreement. Instead, to support his ambiguity argument, Quinlan challenges select phrases within the Arbitration Provision. First, Quinlan contends that the phrase "limited discovery" is one with no real meaning as all discovery is limited.[71] Next, Quinlan challenges the phrase "Arbitration shall be conducted through [JAMS], or another arbitrator if not arbitrable through JAMS" calling it a "convoluted formulation" with no clear meaning.[72] Finally, Quinlan argues that the Arbitration Provision fails to make clear whether JAMS rules will apply if a JAMS arbitrator is unavailable.[73]

Reading the Arbitration Provision as a whole, the phrase "limited discovery" is given meaning by language in the Arbitration Provision that provides arbitration between the parties will be governed by JAMS rules. Thus, discovery between the parties is guided by JAMS rules and there is no ambiguity.

---

[68] *Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021).
[69] *Id.*
[70] *Id.*
[71] AB at 15.
[72] *Id.* at 16.
[73] *Id.*

Next, reading the language objectively, as the Court must do, the Arbitration Provision makes clear that if JAMS cannot arbitrate the dispute at hand, then the parties will select another arbitrator. This is a simple if-then phrase, which makes clear that arbitration will not be stalled because the parties' first choice forum is inaccessible. Recognizing that possibility, the Arbitration Provision further provides that "[e]ach party will reasonably participate in the process of choosing a neutral arbitrator[.]"[74]

As to the Quinlan's final challenge, the Arbitration Provision makes clear that "JAMS rules in effect at the time of filing…will apply to the Arbitration."[75] The Court will not force a distinction in the rules applied to arbitration conducted by JAMS and arbitration conducted by another arbitrator where none exists. The Arbitration Provision is unambiguous, JAMS rules apply to the parties' arbitration.

Having found the Arbitration Provision unambiguous, the Court finds that a valid arbitration agreement between Plaintiff and MDVIP exists.

## VI.    CONCLUSION

Because the Arbitration Provision delegates arbitrability disputes to the arbitrator and is a validly formed arbitration agreement, the Court will not decide arbitrability issues. Accordingly, MDVIP's Motion is GRANTED.

---

[74] Membership Agreement § 9.
[75] *Id.*

The Court does not reach the merits of MDVIP's arguments made pursuant to Rule 12(b)(6).


**IT IS SO ORDERED**.

/s/Kathleen M. Miller
Kathleen M. Miller, Judge