# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| HBMA HOLDINGS, LLC, a Delaware limited liability company, STRUCTHERM HOLDINGS LIMITED, an English private limited company, HANSON AMERICA HOLDINGS (4) LIMITED, an English private limited company, and HANSON PACKED PRODUCTS LIMITED, an English private limited company, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 12806-VCMR |
| LSF9 STARDUST HOLDINGS LLC, a Delaware limited liability company, and LSF9 CONCRETE LTD., a Channel Islands company, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: September 21, 2017
Date Decided: December 8, 2017

Thomas E. Hanson, Jr., BARNES & THORNBURG LLP, Wilmington, Delaware; Joseph R. Kave, BARNES & THORNBURG LLP, Chicago, Illinois; *Attorneys for Plaintiffs*.

Raymond J. DiCamillo and Matthew D. Perri, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Angela C. Zambrano, Yolanda C. Garcia, and Robert S. Velevis, SIDLEY AUSTIN LLP, Dallas, Texas; *Attorneys for Defendants*.

**MONTGOMERY-REEVES, Vice Chancellor.**

This case arises from a dispute concerning the proper earnout the purchasers should pay to the sellers under a purchase agreement. The purchasers and sellers entered into a purchase agreement in 2014 that allowed for an earnout payment of up to $100 million based on the first year of performance after the sale. At the end of the first year, they came to different conclusions about the amount of earnout owed to the sellers, and their disagreements did not stop there.

The purchase agreement included a special arbitration provision for disputes about the earnout amount that required the parties first to negotiate with each other and then to engage a neutral accountant to settle any unresolved objections to the earnout calculation. The parties could not agree on which documents needed to be exchanged between them to determine the unresolved objections, which unresolved objections should go to the neutral accountant, or even what types of claims the sellers were pursuing.

The sellers come to the Court seeking an order that requires arbitration of all the sellers' unresolved objections to the earnout calculation. The sellers also assert breach of contract and indemnification claims and seek damages for the same. The purchasers have moved to dismiss the complaint for two reasons. First, although the purchasers agree that arbitration is required, they argue that the neutral accountant can only consider a narrow set of accounting-related disputes. Second, the purchasers contend that the only available breach of contract claim under the

1

purchase agreement is an indemnification claim for breach of a covenant. But, the purchasers assert that the statute of limitations has run for any indemnification claims under the purchase agreement.

The contract language grants the neutral accountant authority over the sellers' unresolved objections. A review of all the related contract provisions reveals that, in actuality, the interrelated contract terms give the neutral accountant jurisdiction over the calculation of adjusted EBITDA under the purchase agreement. I hold that this jurisdiction includes the ability to determine which of the sellers' unresolved objections to consider when calculating the adjusted EBITDA. In the event that the neutral accountant finds it cannot consider a particular unresolved objection, then the only available remedy for the sellers would be to bring an indemnification claim. I hold, however, that such claims are time barred.

I.    BACKGROUND

All facts derive from the Verified First Amended Complaint (the "Complaint") and the documents incorporated therein.

A.    Parties

The Plaintiffs are HBMA Holdings, LLC, a Delaware limited liability company with a principal place of business in Irving, Texas; Structherm Holdings Limited, Hanson America Holdings (4) Limited, and Hanson Packed Products

Limited, are all English private limited companies with principle places of business in Maidenhead, United Kingdom.

The Defendants are LSF9 Stardust Holdings LLC, a Delaware limited liability company with an address for service in Wilmington, Delaware, and LSF9 Concrete Ltd., a Channel Islands company with a principal place of business at St. Helier, Jersey. LSF9 Concrete Ltd. is the assignee of all LSF9 Stardust Holdings LLC's rights, title, and interest in the purchase agreement.

## B. Facts

On December 23, 2014, Plaintiffs entered into a purchase agreement (the "Agreement") to sell to Defendants several building products companies (the "Companies") in North America and the United Kingdom.[1] The transaction closed on March 13, 2015 with a purchase price of $1.4 billion—$100 million of which was payable as an earnout based on the Companies' performance from January 1 to December 31, 2015 (the "Earnout Period").[2] The Agreement included an arbitration agreement, whereby disagreements about the earnout would be decided by "an internationally recognized accounting firm reasonably acceptable to the [Plaintiffs] and [Defendants]" (the "Neutral Accountant").[3]

---

[1] Compl. ¶ 19.

[2] *Id.*

[3] Compl. Ex. B, at 9.

Pursuant to the Agreement, Defendants provided an Initial Earnout Statement[4] on April 14, 2016.[5] This Initial Earnout Statement calculated Adjusted EBITDA,[6] the agreed upon metric for measuring performance, to be $164 million.[7] The threshold Adjusted EBITDA for Plaintiffs to receive any earnout was $212.2

---

[4]   Defined in the Agreement as "a written statement setting forth the Purchaser's calculation, together with reasonable supporting detail, of the Earnout Amount." *Id.* at Ex. B, at 23.

[5]   Compl. ¶ 42.

[6]   Defined in the Agreement as "the audited consolidated net income (loss) of the Purchaser (which will consist solely of the combined net income (loss) of the Companies and the Company Subsidiaries), adjusted to add back or deduct, as the case may be (in each case, without duplication and in respect of the Companies and the Company Subsidiaries only): (i) results from discontinued operations, (ii) interest expense and interest income; (iii) income taxes; (iv) depreciation; (v) amortization (including impairment); (vi) restricting charges recorded under GAAP, (vii) fees, costs and expenses incurred in connection with the transactions contemplated by this Agreement; (viii) profit or loss on sale of property, plant and equipment; (ix) extraordinary gains and losses, (x) consulting, management, advisory fees or analogous fees paid to any Affiliate of the Purchaser, including Hudson Advisors; and (xi) any standalone costs greater than $50 million (which represents the sum of the $38 million in standalone costs anticipated by the Sellers and an additional $12 million in standalone costs anticipated by the Purchaser), it being agreed that 'standalone costs' for purchases of this definition will consist of the categories of costs described in Schedule 1.01(a). Adjusted EBITDA shall further exclude (A) all effects of purchase accounting with respect to the transactions contemplated by this Agreement and (B) all effects arising from the direct or indirect acquisition by the Purchaser of, and subsequent operation of, any business or third Person." *Id.* at Ex. B, at 2.

[7]   Compl. ¶ 42.

million, and for them to receive the full $100 million earnout, Adjusted EBITDA needed to be $223.7 million.[8]

Under the Agreement, Plaintiffs had forty-five days after receipt of the Initial Earnout Statement to deliver to Defendants their notice of acceptance of the Initial Earnout Statement or "a detailed statement describing its objections to the Initial Earnout Statement," defined in the Agreement as the "Notice of Disagreement."[9] During this forty-five day period, the Agreement required Defendants to give Plaintiffs "reasonable access" to "the relevant financial books and records" and "the individuals responsible for the preparation of the Initial Earnout Statement and 2015 Financial Statements."[10]

Beginning on April 15, 2016, Plaintiffs attempted to reconcile the Initial Earnout Statement and requested support from Defendants.[11] Allegedly, this process was difficult, and Plaintiffs contend that Defendants did not give them the reasonable access required under the Agreement.[12] On May 23, the Parties agreed to a fifteen-

---

[8]      *Id.* ¶ 25.

[9]      *Id.* ¶ 33.

[10]      *Id.* at Ex. B, at 23-24.

[11]      Compl. ¶ 47.

[12]      *Id.* ¶¶ 47-57.

day extension to allow Plaintiffs to issue their Notice of Disagreement by June 13, 2016.[13]

On June 13, 2016, Plaintiffs issued their Notice of Disagreement, wherein they objected to three categories of Defendants' actions: (1) Defendants' calculation of Adjusted EBITDA;[14] (2) Defendants' running of the company during the Earnout Period;[15] and (3) Defendants' refusal to provide the access to documents and financial information required by the Agreement.[16]

The Parties attempted to negotiate the Disputed Items[17] in the Notice of Disagreement until June 30, 2016, when Defendants requested that the Parties engage a Neutral Accountant.[18] The Parties attempted to draft an engagement letter

---

[13] *Id.* ¶ 57.

[14] *Id.* ¶ 59.

[15] Plaintiffs claim Defendants violated a covenant in the Agreement, Section 5.19, that required Defendants to operate the Companies in the ordinary course consistent with past practice. *Id.* ¶ 60.

[16] *Id.* ¶ 61.

[17] Defined in the Agreement as "those matters specified in such Notice of Disagreement…." *Id.* at Ex. B, at 21.

[18] Compl. ¶ 71. The Neutral Accountant is defined in the Agreement as "an internationally recognized accounting firm reasonably acceptable to the Sellers and the Purchaser." *Id.* at Ex. B, at 9.

for the Neutral Accountant from June 30 until September 27, 2016, but they never reached an agreement.[19]

Plaintiffs filed their Verified Complaint (the "Original Complaint") on October 5, 2016. Defendants filed their first Motion to Dismiss on November 7, 2016. Plaintiffs filed their Verified First Amended Complaint (the "Complaint") on January 6, 2017. Defendants filed this Motion to Dismiss on January 23, 2017. The Court heard oral arguments on this Motion to Dismiss on September 21, 2017.

## II.  ANALYSIS

### A.  Standard of Review

Defendants move to dismiss the Complaint under Delaware Court of Chancery Rules 12(b)(1), arguing the Court lacks subject matter jurisdiction due to an arbitration agreement between the Parties. Defendants also seek dismissal under Rule 12(b)(6), contending Plaintiffs fail to state a claim because their indemnification claims are time barred.

#### 1.  Rule 12(b)(1): Motion to Dismiss for Lack of Subject Matter Jurisdiction

Plaintiffs bear the burden of establishing subject matter jurisdiction.[20]  In reviewing a motion to dismiss for lack of subject matter jurisdiction a court may

---

[19]  Compl. ¶¶ 74-84.

[20]  *E.I. du Pont de Nemours & Co. v. Bayer Crop., L.P.*, 2008 WL 2673376, at *2 (Del. Ch. July 2, 2008).

7

consider documents outside the complaint.[21] A court must also "examine the pleadings to determine the true substance of the relief the [plaintiff] seeks, and will not be bound by the form of relief as described [by the plaintiff]."[22]

Delaware courts lack subject matter jurisdiction to resolve disputes that litigants have contractually agreed to arbitrate.[23] There is a strong public policy in favor of arbitration in Delaware; thus, a motion to dismiss for lack of subject matter jurisdiction will be granted if the "dispute is one that, on its face, falls within the arbitration clause of the contract."[24]

### 2. Rule 12(b)(6): Motion to Dismiss for Failure to State a Claim

When reviewing a motion to dismiss for failure to state a claim, a court must accept all well-pled factual allegations as true, and "even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim."[25] A court also must draw all reasonable inferences in favor of the non-moving party.[26] Dismissal will

---

[21]  *Id.*

[22]  *Id.*

[23]  *NAMA Hldgs., LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 429-30 (Del. Ch. 2007).

[24]  *SBC Inter., Inc. v. Corp. Media P'rs*, 714 A.2d 758, 761 (Del. 1998).

[25]  *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002).

[26]  *Id.* at 897.

be appropriate only if the "plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof."[27]

Though the Court must accept well-pled facts as true, it is not required to accept any conclusory allegations "without specific supporting factual allegations."[28] Moreover, a trial court must accept only those "reasonable inferences that logically flow from the face of the complaint" and "is not required to accept every strained interpretation of the allegations proposed by the plaintiff."[29]

A claim will be dismissed for failure to comply with the statute of limitations "if the facts pled in the complaint, and the documents incorporated within the complaint, demonstrate that the claims are untimely."[30] The plaintiff bears the burden to plead facts that demonstrate the applicability of an exception to the statute of limitations.[31] "When that burden is not met, the court must dismiss the complaint if filed after expiration of the limitations period."[32]

---

[27] *Kofron v. Amoco Chems. Corp.*, 441 A.2d 226, 227 (Del. 1982).

[28] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006).

[29] *Id.*

[30] *CertainTeed Corp. v. Celotex Corp.*, 2005 WL 217032, at *6 (Del. Ch. Jan. 24, 2005).

[31] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 2012 WL 3201139, at *15 (Del. Ch. Aug. 7, 2012).

[32] *CertainTeed*, 2005 WL 217032, at *6.

**B.** **The Parties Agree that the Neutral Accountant Has the Ability to Compel Discovery Between the Parties**

The Parties reached an agreement at oral argument that the Neutral Accountant has the power to compel discovery between the Parties, not just for the documents that must be turned over to the Neutral Accountant, but also as to any documents to be exchanged between the Parties in order to complete briefing for the Neutral Accountant.[33]  Thus, there is no dispute between them on this issue.

**C.** **The Neutral Accountant Has Jurisdiction over the Calculation of Adjusted EBITDA**

The Parties disagree about the scope of the Neutral Accountant's jurisdiction. Defendants argue that the Neutral Accountant only has jurisdiction over "a narrow set of accounting-related disputes over the calculation of the earnout payment using a fixed accounting methodology."[34]  Plaintiffs argue that the Neutral Accountant has jurisdiction over all Disputed Items in the Notice of Disagreement.[35]  Ultimately, I conclude that the Neutral Accountant has jurisdiction over the calculation of Adjusted EBITDA, which includes the ability to determine which of the Disputed Items fall into the definition of Adjusted EBITDA.

---

[33]     Oral Arg. Tr. 93-94.

[34]     Defs.' Opening Br. 20.

[35]     Pls' Opp'n Br. 24.

"Under the identical teaching of the United States Supreme Court and the Delaware Supreme Court, questions of substantive arbitrability require judicial resolution unless the parties' contract clearly and unmistakably provides otherwise."[36] The court must engage in a two-part inquiry to determine substantive arbitrability.

> First, the court must determine whether the arbitration clause is broad or narrow in scope. Second, the court must apply the relevant scope of the provision to the asserted legal claim to determine whether the claim falls within the scope of the contractual provisions that require arbitration. If the court is evaluating a narrow arbitration clause, it will ask if the cause of action pursued in court directly relates to the right in the contract. If the arbitration clause is broad in scope, the court will defer to arbitration on any issues that touch on contract rights or contract performance.[37]

Following this two-part inquiry, I first hold that the clause at issue in this case is a narrow one. The clause reads:

> If the US Seller and the Purchaser do not reach a resolution of all Disputed Items within thirty (30) days after delivery of such Notice of Disagreement, the US Seller and the Purchaser shall, within ten (10) days following the expiration of such thirty (30) day period, engage the Neutral Accountant to resolve any Unresolved Objections.[38]

---

[36] *Willie Gary LLC v. James & Jackson LLC*, 2006 WL 75309, at *1 (Del. Ch. Jan. 10, 2006).

[37] *Parfi Hldgs. AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 155 (Del. 2002).

[38] Compl. Ex. B, at 21.

Next, I must determine whether the claim falls within the scope of this narrow provision. The Agreement grants the Neutral Accountant jurisdiction over Unresolved Objections.[39] A review of the contractual provisions of the Agreement, focusing on the interconnecting definitions, reveals that jurisdiction over Unresolved Objections, in actuality, means the Neutral Accountant has jurisdiction over the calculation of Adjusted EBITDA.[40] That analysis is as follows. An Unresolved Objection is any Disputed Item not resolved by the Parties within thirty days of delivery of the Notice of Disagreement.[41] Disputed Items for purposes of Section 2.08 ("Earnout") are the matters specified in the Notice of Disagreement.[42] Matters specified in the Notice of Disagreement are contractually limited to objections to the Initial Earnout Statement.[43] The Initial Earnout Statement is "a written statement

---

[39]     *Id.*

[40]     If the analysis were to stop with a cursory review of only the arbitration clause, one could mistakenly conclude that a party could shoehorn any type of claim into arbitration simply by including it in the Notice of Disagreement. This seems to be what Defendants are afraid of here. A more careful review of how the definitions in the Agreement work together, however, shows this is not the case.

[41]     *Id.*

[42]     *Id.* at 23.

[43]     *Id.* at 24.

12

setting forth the Purchaser's calculation, together with reasonable supporting detail, of the Earnout Amount."[44]  The Earnout Amount is defined as:

> an amount equal to: (a) the result of (i) the Adjusted EBITDA for the calendar year ended December 31, 2015 (as derived from the 2015 Financial Statements and the books and records of the Purchaser and its Subsidiaries) minus (ii) $212.2 million multiplied by (b) 8.70; provided that if the Earnout Amount is a positive amount that is greater than $100 million, the Earnout Amount shall mean an amount equal to $100 million.  If the Earnout Amount would be a negative number, it shall be deemed to be zero.[45]

The only variable in the Earnout Amount is "the Adjusted EBITDA for the calendar year ended December 31, 2015."[46]  Therefore, the Neutral Accountant has jurisdiction over the determination of Adjusted EBITDA.  The substantive arbitrability analysis ends with this articulation of the Neutral Accountant's jurisdiction.

What the Neutral Accountant can look at to determine Adjusted EBITDA is a question of procedural arbitrability left to the Neutral Accountant. "If the subject matter to be arbitrated is the calculation of an earn-out, or the amount of working capital, or the company's net worth at closing, all issues as to what financial or other

---

[44]     *Id.* at 23.

[45]     *Id.* at 5.

[46]     *Id.*

13

information should be considered in performing the calculation are decided by the arbitrator."[47] Whether an Unresolved Objection falls into the definition of Adjusted EBITDA will therefore be for the Neutral Accountant to determine. The Neutral Accountant may "rely on the terms of the underlying agreement, and the arbitrator's interpretation of the contract is likely to affect the scope of arbitration. Nonetheless, those decisions fall within the category of procedural arbitrability. They are not 'gateway' issues about whether the particular dispute should be arbitrated at all."[48] The Parties may have drafted a narrow arbitration clause, but the subject matter of this case falls squarely within it and must be decided by the Neutral Accountant as a matter of procedural arbitrability.[49]

### D. Plaintiffs' Breach of Contract and Indemnification Claims Are Time Barred

If Plaintiffs wish to pursue a remedy for any of the Unresolved Objections the Neutral Accountant determines should not be considered in the calculation of Adjusted EBITDA, then they will need to pursue an indemnification claim in the

---

[47]     *Viacom Int'l Inc. v. Winshall*, 72 A.3d 78, 83 (Del. 2013).

[48]     *Id.*

[49]     Moreover, the Court could not even attempt to resolve this issue as the Parties have not briefed whether each Disputed Item falls into Adjusted EBITDA. Even the nature of the dispute is unclear based on the Parties' submissions. In Defendants' response to the Notice of Disagreement, they do not dispute, *per se*, Plaintiffs' objections, but merely request more information pertaining to Plaintiffs' calculations. Compl. Ex. D.

Court of Chancery. For the reasons set forth below, however, any indemnification claim is time barred by the Parties' contractual statute of limitations.

**1. Plaintiffs' Notice of Disagreement did not serve as proper notice under the Agreement**

In the Notice of Disagreement, Plaintiffs included several disputes that were related to conflicts with or breaches of Section 5.19 of the Agreement. Section 5.19 is a covenant that requires Defendants to operate the Companies in the ordinary course consistent with past practice for the Earnout Period.[50] Section 9.06 of the Agreement limits the remedy for breach of a covenant to indemnification.[51]

Section 9.01 of the Agreement provides that covenants would survive until the General Survival Date, June 13, 2016.[52] Under Delaware law, parties to a contract may shorten the default statute of limitations by agreement as long as the agreed upon time period is reasonable.[53] Delaware courts read unambiguous

---

[50] While I acknowledge that Section 5.19 of the Agreement is a covenant, this acknowledgment should not be considered a limitation, in any way, on the Neutral Accountant's jurisdiction as previously stated.

[51] Compl. Ex. B, at 91 ("[T]he indemnification provisions of Article IX shall be the sole and exclusive remedies of the parties hereto . . . for any failure to perform or comply with any covenant or agreement in this Agreement.").

[52] *Id.* at 87.

[53] *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2011 WL 2682898, at \*6 (Del. Ch. July 11, 2011).

survival clauses in purchase agreements as contractual statutes of limitations.[54] This means claims must be filed before the survival period expires.[55] Section 9.01, however, also includes an exception. If a party complies with Section 9.05 of the Agreement and gives proper notice of the indemnification claim before the General Survival Date, then the claim will survive until "it is fully and finally resolved."[56]

The original Complaint in this case was filed on October 5, 2016. The Amended Complaint, wherein Plaintiffs first requested indemnification, was filed on January 6, 2017. Both of these dates are past the General Survival Date of June 13, 2016. The issue, then, is whether Plaintiffs gave proper notice of their indemnification claim before June 13, 2016, thus triggering the exception in Section 9.01 and allowing the claim to survive until "it is fully and finally resolved."[57] For the reasons set forth below, I find that they did not.

Section 9.05(a) of the Agreement governs proper notice for indemnification claims. It reads:

> An Indemnified Party shall give the Indemnifying Party notice in reasonable detail of any matter which an Indemnified Party has determined has given rise to a right of indemnification under this Agreement, within thirty

---

[54]  *Id.* at *3.

[55]  *Id.*

[56]  Compl. Ex. B, at 87.

[57]  *Id.*

(30) days of such determination, stating the amount of Loss, if known, and the method of computation thereof, and containing a reference to the provisions of this Agreement in respect of which such right of indemnification is claimed or arises; provided however, that the failure to provide such notice shall not release the Indemnifying Party from any of its obligations under this Article IX except to the extent that the Indemnifying Party is actually prejudiced by such failure.[58]

The Notice of Disagreement does not mention indemnification or reference the provision granting Plaintiffs a right of indemnification.[59] Plaintiffs included only the provision containing the covenant they were claiming Defendants had breached, Section 5.19.[60] This makes sense in the broader context of this entire disagreement, including the discussion of the Neutral Accountant's jurisdiction above. Plaintiffs were not actually seeking indemnification in the Notice of Disagreement.[61] They were seeking a recalculation of Adjusted EBITDA.[62] That is, Plaintiffs contend that Defendants artificially depressed the Adjusted EBITDA by failing to run the

---

[58]     *Id.* at 89.

[59]     Compl. Ex. C.

[60]     *Id.*

[61]     Oral Arg. Tr. 71.

[62]     *Id.*

17

Companies in the ordinary course of business as required by the Agreement.[63]

Moreover, this is consistent with the fact that Plaintiffs did not mention indemnification in their Original Complaint.[64] Plaintiffs only requested indemnification after Defendants raised the issue in their first opening brief filed on December 7, 2016.[65]

Ultimately, the contractual statute of limitations to which the Parties agreed prevents Plaintiffs from pursuing a claim for indemnification unless the Notice of Disagreement satisfied the requirements of proper notice under Section 9.05(a). Unfortunately for Plaintiffs, the Notice of Disagreement failed to do that which it was not intended to do and did not meet the requirements of proper notice agreed to by the Parties. Defendants were not given proper notice pursuant to Section 9.05(a) before the General Survival Date; therefore, the indemnification claims are time barred in the Court of Chancery.

### 2. The doctrines of estoppel, waiver, and acquiescence do not apply to Plaintiffs' claims

Finally, Plaintiffs raise the doctrines of estoppel, waiver, and acquiescence in an attempt to block Defendants' Motion to Dismiss. None of these doctrines apply

---

[63] This is an argument that may be considered by the Neutral Accountant in the context of the calculation of Adjusted EBITDA.

[64] Pls.' Original Compl. 39-42 (Oct. 5, 2016).

[65] Defs.' Opening Br. 26 (Dec. 7, 2016); Comp. 43-47.

to the present case because all of Defendants' behavior that Plaintiffs rely on for these arguments took place after the contractual statute of limitations ran. For either estoppel, waiver, or acquiescence to apply Plaintiffs must allege that Defendants took some action before the contractual statute of limitations ran on June 13, 2016. Plaintiffs do not point to any such action. In fact, Plaintiffs' arguments are limited to Defendants' reactions to the Notice of Disagreement, which was sent on June 13, 2016.[66] Those reactions to receiving the Notice of Disagreement came after the contractual statute of limitations ran.[67] Defendants' conduct after the contractual statute of limitations ran is powerless to revive the claims that were contractually extinguished on June 13, 2016.

## III. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED.

**IT IS SO ORDERED**.

---

[66] Pls.' Answering Br. 55 ("Lone Star's course of conduct – both in its response to the Notice of Disagreement and in its subsequent communications – constitutes a waiver, an acquiescence and an estoppel.").

[67] Compl. 58; *Id.* Ex. B, at 87.