# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

CHANNEL PES ACQUISITION CO., LLC,

          Plaintiff,

          v.

HERITAGE-CRYSTAL CLEAN, INC.,

          Defendant.

)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. N23C-08-206 MAA CCLD

Submitted: March 28, 2024
Decided: June 30, 2024

*Upon Defendant's Motion to Dismiss the First Amended Complaint:*
GRANTED in Part, and DENIED in Part.

## <u>MEMORANDUM OPINION</u>

Stamatios Stamoulis, Esquire, and Richard C. Weinblatt, Esquire, of STAMOULIS & WEINBLATT LLC, Wilmington, Delaware, and Richard A. Schwartz, Esquire (Argued), of ROSS LLP, Los Angeles, CA, *Attorneys for Plaintiff.*

John P. DiTomo, Esquire, and Alec F. Hoeschel, Esquire, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware, and Brian J. Massengill, Esquire, and Matthew E. Fenn, Esquire (Argued), of MAYER BROWN LLP, Chicago, IL, *Attorneys for Defendant.*

**Adams, J.**

# I.    INTRODUCTION

Plaintiff entered into an agreement with defendant to sell an environmental services company.  As part of the purchase agreement, the parties agreed that the purchase price would be determined at closing based on a post-closing true-up.  The parties also agreed that disputes relating to that calculation would be submitted to arbitration rather than through litigation.  The parties set aside escrow funds for potential claims, and defendant-buyer agreed to release those funds back to seller after certain conditions were met.  After closing, plaintiff-seller disputes defendant-buyer's post-closing calculations, and defendant-buyer's refusal to release the escrow funds.  The parties have also proceeded through the dispute resolution process and received a Final Determination from an Arbitrator.  Defendant moved to dismiss all of plaintiff's claims on both procedural and substantive grounds.  For the reasons that follow, the motion to dismiss is **GRANTED** in part, and **DENIED** in part.

## II.   FACTS[1]

### A.   THE PARTIES

Plaintiff, Channel PES Acquisition Co., LLC ("Plaintiff" or "Seller"), filed suit against Defendant, Heritage-Crystal Clean, Inc. ("Defendant" or "Buyer"), a Delaware company.[2]  Seller is a group of hands-on investors with its headquarters in Santa Monica, California.[3]  Buyer is a billion-dollar public company.[4]

### B.   PLAINTIFF SELLS PATRIOT TO BUYER

In 2014, Seller acquired Patriot Environmental Services Inc. ("Patriot" or "the Company"), "an environmental services company that specializes in industrial hazardous and non-hazardous waste management[.]"[5]  Seller oversaw the day-to-day operations of Patriot and was thus very familiar with its financial and accounting functions.[6]

On June 29, 2022, the parties entered into the Stock Purchase Agreement (the "SPA"), which facilitated Plaintiff's sale of its wholly owned subsidiary, Patriot, to Defendant.[7]  The sale was for approximately $156 million subject to a post-Closing

---

[1] The facts are drawn from the First Amended Complaint and the Stock Purchase Agreement (Ex. 1 to Defendant's Opening Brief in Support of Defendant's Motion to Dismiss) which is incorporated by reference to the Complaint. *See In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169 (Del. 2006).
[2] Am. Compl. ¶ 14.
[3] *Id.* ¶¶ 17, 19.
[4] *Id.* ¶ 20.
[5] *Id.* ¶¶ 1, 19.
[6] *Id.* ¶ 19.
[7] *Id.* ¶¶ 1, 21.

true-up, "although the SPA provided that adjustments to the purchase price would be made after the transaction closed based on Patriot's financial condition as of August 3, 2022 ("Closing")[.]"[8]  Buyer gained control of Patriot on the Closing date.[9]

Patriot's financial condition at Closing was to be based on information within the Buyer's exclusive control, so the SPA detailed Buyer's "affirmative obligation to conduct and accurately maintain a 'good faith calculation (in reasonable detail)' after Closing of all Company accounts."[10]  Between the time that the parties signed the SPA and the Closing (the "Interim Period"), it was crucial that Buyer make good faith calculations under the SPA because "[b]ooks and records would not be finalized until several weeks or even months after the Closing[.]"[11]  In anticipation of the necessity, the parties stipulated in the SPA that Buyer must produce a broad range of documents and provide access to Seller to check Buyer's accounting practices during the Interim Period.[12]  The significant revenue earned during the Interim Period belonged to Seller, but would not be known until Patriot was under the exclusive control of Buyer.[13]

---

[8] *Id.*
[9] *Id.* ¶ 1.
[10] *Id.* ¶ 2.
[11] *Id.*
[12] *Id.* ¶ 4.
[13] *Id.* ¶ 3.

Seller estimated Patriot would continue to perform as it had in the months before the Interim Period, and Seller relayed this estimation to Buyer before Closing.[14] During the weeks leading up to Closing, Patriot executives updated Buyer on Patriot's performance, but these updates never included discussions of issues or substantial drops in Patriot's performance.[15]

## C. SUPPRESSION OF FINAL REVENUE ACCOUNTING FOR INTERIM PERIOD

Before Buyer delivered the Closing Date Statement, but after Closing, "Buyer caused Patriot to provide certain credits to Patriot's customers that would have the effect of customers paying for obligations incurred during the Interim Period on invoices that would be recognized during post-Closing periods[.]"[16]

Buyer neither provided Seller access to Company records nor produced all the documents that Seller requested, but Seller was able to ascertain that Buyer made false assertions regarding revenue earnings before Closing.[17] Although "Patriot averaged $10.2 million in revenue for the six months before Closing," "Buyer claims that July 2022 revenue fell 26% from the June 2022 level, to $7.7 million."[18] Company performance, however, had been consistent in July 2022, and Buyer's issuance of credits to customers after Closing for work performed before Closing

---

[14] *Id.* ¶ 22.
[15] *Id.*
[16] *Id.* ¶ 23.
[17] *Id.* ¶¶ 5–6.
[18] *Id.* ¶ 6.

caused the decline in revenue earnings.[19] This accounting practice allegedly violated the express terms of the SPA.[20] Immediately after Closing in August 2022, "Patriot's revenue returned to pre-Closing levels, and even exceeded the prior six-month average."[21] Revenue increased 41% from July 2022 to $10.7 million in August, then to $11.2 million in September 2022.[22]

Patriot's then-CFO confirmed Patriot had not authorized the issuance of credits during the Interim Period.[23] Seller "earned and was entitled to" the revenue that came in during this period, but Buyer's accounting enabled Buyer to collect the revenue after Closing.[24] Neither the SPA nor generally accepted accounting principles ("GAAP") gave Buyer the right to "issue credits that would apply to periods when Seller owned the Company or to send customers new invoices post-Closing that included pre-Closing work."[25] As a result of the credits, Buyer reduced the purchase price of the Company at Closing.[26] The information that Seller requested and Buyer did not produce "would show Buyer's misconduct."[27]

---

[19] Id. ¶ 7.
[20] Id.
[21] Id. ¶ 8.
[22] Id.
[23] Id. ¶ 10.
[24] Id.
[25] Id. ¶ 11.
[26] Id.
[27] Id.

SPA § 2.4(b) mandates that Buyer make a "good faith calculation" of the Interim Period accounts "in reasonable detail" and "based solely on facts and circumstances as they exist as of the Effective Time or the Closing[.]"[28] The SPA also required Buyer to provide documents supporting its calculations.[29] Buyer's obligation to produce documents is broad pursuant to § 2.4(c)(i).[30] Buyer slowly produced minimal documents "just five days before the end of the 30-day period when Seller could object to Buyer's accounting," preventing Seller from challenging Buyer's accounting practices through arbitration.[31] This small amount of Buyer's document production allegedly demonstrates Buyer's fraudulent suppression of Patriot's pre-Closing revenue.[32]

Seller alleges Buyer's minimal document production shows one of two things. Either: (1) "Buyer provided credits to customers post-Closing but retroactive to July 31—when Buyer had no right to provide any credits" or (2) "Buyer later reversed the 'credits' and re-billed those customers in the months after Closing."[33] Patriot's accounting system uniquely requires that to make any change in an invoice, one must delete it in its entirety and reissue the old invoice with a new date.[34] "Seller believes

---

[28] *Id.* ¶ 27.
[29] *Id.*
[30] *See id.* ¶¶ 28–29.
[31] *Id.* ¶¶ 30–32.
[32] *Id.* ¶ 33.
[33] *Id.* ¶ 34.
[34] *Id.*

that Buyer abused this accounting system software quirk by transferring pre-Closing revenue to the post-Closing period."[35] In one month, Buyer issued a larger dollar amount of unauthorized credits than the total amount Seller issued in the eight years that Seller owned Patriot.[36] Patriot's then-CFO, Geoffrey Milbrandt, had not been aware of Buyer's issuance of these unauthorized credits, distinguishing this instance from Patriot's previous adjustment of accrued revenue totals.[37] In that instance, the totals pertained to a one-off Huntington Beach/Amplify Energy oil spill in October 2021 and resulted from negotiated settlements with insurance companies and other involved parties.[38]

Milbrandt "refused to comply with Buyer's request to engage in the unusual accounting that harmed Seller," and lost his job shortly after.[39] The Corporate Controller of Buyer, Carol Okamoto, testified that she "collaborated with Jeff Vejselli at Buyer to issue improper credits for pre-Closing jobs."[40] Seller asserts those "revenue manipulations" violate several GAAP accounting rules and the SPA, amounting to fraud as a matter of law.[41] Buyer "under-accrued revenue by several

---

[35] *Id.*
[36] *Id.* ¶ 35.
[37] *Id.* ¶¶ 35, 37.
[38] *Id.* ¶ 35.
[39] *Id.* ¶ 37.
[40] *Id.* ¶ 36.
[41] *Id.* ¶ 38.

million dollars" and violated its duty to make "good faith calculation[s]" by "billing revenue to customers for periods when [Buyer] did not control Patriot."[42]

## D. ARBITRATION

The SPA provides in Section 2.4(c)(ii) that the "arbitration is 'limited to resolving such objections and determining the correct calculations to be used on only the disputed portions of the Closing Date Statement as set forth in the Dispute Notice (to the extent not otherwise resolved by the parties pursuant to this Section 2.4(c))."[43] The parties have already arbitrated over post-Closing matters.[44] Buyer contends that the sole purpose of arbitration is for "correct[ing] calculations" and limited to "what Seller places on the Dispute Notice."[45] According to the complaint, the arbitrator refused to arbitrate the purchase price dispute "based on adjustments that were not contained in Buyer's dispute notice—which Seller necessarily formulated in reliance on the fraudulent and insufficient information Buyer provided to Seller following Closing."[46] The arbitrator only arbitrated the "determination of the purchase price under the SPA."[47]

At issue is the fact that Seller purportedly could not provide an exhaustive list of items in the Dispute Notice because Buyer failed to produce requested

---

[42] *Id.* ¶ 39.
[43] *Id.* ¶ 40.
[44] *Id.*
[45] *Id.* ¶ 41.
[46] *Id.* ¶ 42.
[47] *Id.*

9

documents—an act which constitutes a breach of the SPA.[48]  Buyer also inhibited Seller from "discovering and including the bogus credits (and other improper actions by Buyer) in the accounting-arbitration."[49]  Seller did include in the Dispute Notice, however, Buyer's failure to produce documents and that Seller "reserved its rights under the SPA to seek redress outside of [a]rbitration for these breaches by Buyer."[50]

The arbitration was limited to the determination of "the validity of the numbers included on the 'Dispute Notice,' which is a defined term under the SPA."[51]  Seller, thus, asserts that adjudication in this Court is appropriate, and the SPA does not limit remedies for fraudulent claims.[52]  Seller also alleges Buyer further violated the SPA's requirement to arbitrate credits because Buyer failed to produce credit-related documents in a timely manner.[53]

E.    ESCROW

The SPA required Buyer to release the representations-and-warranties escrow one year after Closing, and Buyer refused to do so.[54]  Sections 8.1 and 8.2 of the SPA provide that Seller's "representations and warranties contained in the SPA" and "indemnification obligations . . . with respect to such representations and warranties

---

[48] *Id.* ¶¶ 43–44.
[49] *Id.* ¶ 44.
[50] *Id.* ¶ 43.
[51] *Id.*
[52] *Id.* ¶ 47.
[53] *Id.* ¶ 48.
[54] *Id.* ¶ 12.

10

expired on August 3, 2023, *i.e.,* twelve months after the Closing Date (as defined in the SPA) and the date of the Escrow Agreement."[55] Buyer deposited the Indemnity Escrow Amount into the Indemnity Escrow Account.[56] This deposit satisfied the indemnification payment obligations enumerated in Section 8.6 of the SPA.[57] On the expiration date, August 3, 2023, Seller requested that Buyer release the funds "in accordance with the terms of the Escrow Agreement by executing and delivering to the Escrow Agent the Joint Release instructions."[58] Although Seller complied with all representations and warranties, Buyer refused to release the funds.[59]

Buyer instead made a claim against Seller about a dormant matter over ten years old, but Buyer never mentioned the allegation in any of its SEC filings, disclosures to shareholders, or to its representations-and-warranties insurance carrier.[60] Buyer claimed that it "provide[d] notice of a third party claim that might be satisfied from the Indemnity Escrow."[61] Seller asserts Buyer's claim is invalid because Buyer did not "comply with the express provisions of the SPA to make such a claim valid or a proper basis to refuse to release the Indemnity Escrow."[62] Such provisions are in Section 8.7 of the SPA, providing that in order to make a successful

---

[55] *Id.* ¶ 50.
[56] *Id.* ¶ 51.
[57] *Id.*
[58] *Id.*
[59] *Id.* ¶ 52.
[60] *Id.* ¶¶ 12–13.
[61] *Id.* ¶ 53.
[62] *Id.*

claim against the Indemnity Escrow, the claimant must "provide (a) a written notice (b) setting forth reasonable detail of the facts and circumstances giving rise to such claim for indemnification, and (c) identifying the amount of losses that would result."[63] Buyer did not comply with any of these express conditions.[64]

Seller, in contrast, argues it has complied with all obligations under the SPA.[65] During Seller's control of Patriot, Seller met all SPA requirements, including those in Section 5.2 and 5.1(b)(i)–(ii).[66] Those require that Seller "continue its operations at Patriot 'in the Ordinary Course' during the Interim Period and not to 'transfer any tangible assets except for the sale, transfer, or disposition of finished goods inventory in the Ordinary Course.'"[67]

## III.   PROCEDURAL HISTORY

On August 21, 2023, Seller filed a Complaint alleging seven counts.[68]   On November 7, 2023, Seller filed an Amended Complaint alleging six counts: (1) Breach of Contract;[69] (2) Breach of Contract;[70] (3) Fraudulent Misrepresentation;[71]

---

[63] *Id.*
[64] *Id.*
[65] *Id.* ¶ 54.
[66] *Id.*
[67] *Id.*
[68] D.I. 1.
[69] Am. Compl. ¶¶ 56–67.
[70] *Id.* ¶¶ 68–80.
[71] *Id.* ¶¶ 81–98.

(4) Intentional Breach of Contract;[72] (5) Breach of Contract;[73] and (6) Breach of the Implied Covenant of Good Faith and Fair Dealing.[74] On December 6, 2023, Buyer filed a Motion to Dismiss Seller's First Amended Complaint and an Opening Brief in Support of Buyer's Motion to Dismiss the First Amended Complaint.[75] On January 10, 2024, Seller filed its Opposition to Buyer's Motion to Dismiss the First Amended Complaint.[76] On January 31, 2024, Buyer filed its Reply Brief in Further Support of Buyer's Motion to Dismiss the First Amended Complaint.[77] The Court held oral argument on March 28, 2024 and reserved decision.

## IV. STANDARD OF REVIEW

A defendant may move to dismiss for lack of subject matter jurisdiction pursuant to Superior Court Civil Rule 12(b)(1). In deciding the party's motion, "the Court 'need not accept [the plaintiff's] factual allegations as true and is free to consider facts not alleged in the complaint.'"[78] The plaintiff has the burden to prove there is jurisdiction[79] and thus "'bears the 'far more demanding' burden."[80]

---

[72] *Id.* ¶¶ 99–116.
[73] *Id.* ¶¶ 117–121.
[74] *Id.* ¶¶ 122–130.
[75] D.I. 19, 20, Def.'s Opening Br. in Supp. of Mot. to Dismiss [hereinafter "Def.'s Br."].
[76] D.I. 25, Pl.'s Answering Br. in Opp'n to Def.'s Mot. to Dismiss [hereinafter "Pl.'s Opp'n"].
[77] D.I. 30, Def.'s Reply Br. in Supp. of Mot. to Dismiss [hereinafter "Def.'s Reply"].
[78] *In re Proton Pump Inhibitors Prods. Liab. Litig.*, 2023 WL 5165406, at *5 (Del. Super. Aug. 11, 2023) (quoting *Appriva S'holder Litig., Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1284 n.14 (Del. 2007)).
[79] *See, e.g., Payne v. Samsung Elecs. Am., Inc.*, 2024 WL 726907, at *3 (Del. Super. Feb. 21, 2024).
[80] *Proton Pump Inhibitors*, 2023 WL 5165406, at *5 (quoting *Appriva*, 937 A.2d at 1284 n.14).

Superior Court Civil Rule 12(b)(6) allows a party to move to dismiss a complaint for failure to state a claim. When deciding on a motion to dismiss, "'(i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the 'plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.'"[81] The Court is limited to the matters in the pleadings, with the exception of "where an extrinsic document is integral to a plaintiff's claim and is incorporated into the complaint by reference[.]"[82] The Court may not consider any conclusory allegations without factual support.[83]

---

[81] *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d at 168 (quoting *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[82] *Furman v. Delaware Dep't of Transp.*, 30 A.3d 771, 774 (Del. 2011) (citing *Vanderbilt Income & Growth Assocs. v. Arvida/JMB Managers*, 691 A.2d 609, 613 (Del. 1996)).

[83] *Proton Pump Inhibitors*, 2023 WL 5165406, at *6 (citing *Ramunno v. Crawley*, 705 A.2d 1029, 1034 (Del. 1998)) ("[T]he Court must 'ignore conclusory allegations that lack specific supporting factual allegations.'").

## V.    ANALYSIS[84]

A.    SUBJECT MATTER JURISDICTION OVER COUNTS I, II, III, IV, AND VI.[85]

### 1.    The Parties' Contentions

Buyer asserts Counts I, II, III, IV, and VI all are within the parties' contractually agreed-to arbitration clause, and thus the Court lacks subject matter jurisdiction over them.[86]  The SPA states: "'adjustments to the Estimated Purchase Price and the dispute resolution provisions provided for in Section 2.4(c) shall be the *exclusive remedies* for the matters addressed herein.'"[87]  Buyer claims that all of Seller's aforementioned claims fall within the exclusive scope of the arbitration clause because they are encompassed by Section 2.4(c) of the SPA.[88]

Buyer presents three separate reasons why the arbitration clause governs. First, Buyer notes that Seller conceded this by actively participating in the arbitration proceedings, and raising the same arguments as it now raises in this Court,

---

[84] The Court notes that Seller asserted in its Opposition Brief that "if and to the extent the Court concludes that any aspect of Seller's claims are insufficiently or erroneously pled, leave to amend should be granted to allow Seller to assert claims for rescission and rescissory damages."  Pl.'s Opp'n at 29–30.  The Court declines to grant any leave to amend.  This is Seller's second complaint, having filed an amended complaint after Buyer already filed its first Motion to Dismiss, and doing so without seeking leave of the Court beforehand.  This request is insufficiently justified, and the Court declines to consider it further.

[85] Buyer also moved to dismiss for lack of subject matter jurisdiction over Count V, but withdrew that motion at oral argument so the Court will not address it for purposes of subject matter jurisdiction. *Channel PES Acq. Co. v. Heritage-Crystal Clean, Inc.*, C.A. No. N23C-08-206 MAA CCLD, at 18:22–19:4 (Del. Super. Mar. 28, 2024) (TRANSCRIPT).

[86] Def.'s Br. at 17.

[87] *Id.* at 18–19 (quoting Ex. 1 [hereinafter "the SPA"] § 2.4(d)(iv)) (emphasis added).

[88] *Id.* at 19–20.

impermissibly seeking a "second bite at the apple."[89] Second, Buyer claims "[Seller's] allegations raise questions of procedural arbitrability that are questions for the Arbitration Firm to decide."[90] Third, Seller "cannot now make an end-run around the arbitration process through artful pleading just because it does not like how the arbitration has proceeded."[91]

Seller argues the Court should first determine whether the arbitration clause here is narrow "because it sharply limits the types of disputes that fall within its ambit."[92] Seller then asserts the Court must determine if the challenged conduct falls within the scope of the narrow provision, which Seller claims it does not "because Seller's claims stem from Buyer's misconduct in disabling Seller from learning or raising the true issues requiring resolution through the accounting-arbitration."[93] Seller points to the language in the arbitration provision that "*calculation of* the amount" suggests "that the scope of the arbitrable matters is limited to those in which the parties both have access to the same source data and merely differ as to their use of that source data to calculate Closing Net Working Capital or other salient values."[94]

---

[89] *Id.* at 20.

[90] *Id.* at 21.

[91] *Id.* at 22.

[92] Pl.'s Opp'n at 17 (citing *Milton Inves., LLC v. Lockwood Bros., II, LLC*, 2010 WL 2836404, at *6 (Del. Ch. July 20, 2010)).

[93] *Id.*

[94] *Id.* at 18 (emphasis added).

As an alternative argument, Seller argues the Court "[s]hould [a]ssume [j]urisdiction to [a]void [s]anctioning [f]raud and [u]njust [r]esults[.]"[95]  Seller claims that "Buyer's interpretation of the SPA effectively would constitute an advance release for breaches of certain future contractual obligations, which the law abhors."[96]

In response, Buyer argues that the narrow-ness of the clause does not matter—though Buyer also disputes that it is narrow—because "the only question that matters is whether the claims concern issues that the [p]arties contractually agreed to arbitrate."[97]  Buyer also disagrees with Seller's interpretation of the phrase "calculation of" because the "SPA's arbitration provision governs the entire *process* of resolving 'disputed portions of the Closing Date Statement,' which under the SPA must be properly detailed in Seller's Dispute Notice."[98]  Buyer also notes that Seller failed to address procedural arbitrability in its brief.[99]  Buyer lastly disagrees with Seller's policy argument, stating that "Buyer argues that the claims [Seller] has asserted all fall *within* the arbitration clause" not that all possible claims are limited to the arbitrator.[100]

---

[95] *Id.* at 22.
[96] *Id.* at 22–23.
[97] Def.'s Reply at 4–5.
[98] *Id.* at 6 (emphasis in original).
[99] *Id.* at 8.  Buyer is correct, Seller did not sufficiently brief the substantive/procedural arbitrability issue, but did rely on cases interpreting arbitrability such that the Court will not find a waiver as to the issue.
[100] *Id.* at 12 (emphasis in original).

17

## 2. Delaware Law on Arbitrability

Delaware courts "lack subject matter jurisdiction to resolve disputes that litigants have contractually agreed to arbitrate."[101] More precisely, Delaware courts respect contractual agreements to arbitrate even in cases where sovereign authority grants the court the right to hear a case.[102] Consequently, if a claim "on its face, falls within the arbitration clause of the contract" the Court will grant a motion to dismiss.[103] "A strong presumption exists in favor of arbitration, and, accordingly, contractual arbitration clauses are generally interpreted broadly by the courts."[104] "Delaware courts will compel a party to arbitrate only if the contract reflects that the parties clearly and intentionally bargained for whether and how to arbitrate."[105]

The Supreme Court of Delaware's seminal case of *Parfi Holding AB v. Mirror Image Internet, Inc.*[106] provides guidance on a trial court's handling of arbitration disputes:

---

[101] *NAMA Hldgs., LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 429 (Del. Ch. 2007) (citing *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 295 (Del. 1999)).

[102] *See Gandhi-Kapoor v. Hone Cap. LLC*, 307 A.3d 328, 339 (Del. Ch. 2023) (quoting *Ingres Corp. v. C.A., Inc.*, 8 A.3d 1143, 1145 (Del. 2010)) ("The court does not dismiss the case because it lacks the power to hear it, but because 'where contracting parties have expressly agreed upon a legally enforceable forum selection clause, a court should honor the parties' contract and enforce the clause.'").

[103] *NAMA Hldgs., LLC*, 922 A.2d at 429 (quoting *SBC Interactive, Inc. v. Corp. Media P'rs*, 714 A.2d 758, 761 (Del. 1998)).

[104] *Id.* at 430 (citing *Majkowski v. Am. Imaging Mgmt. Servs., LLC*, 913 A.2d 572, 581–82 (Del. Ch. 2006)).

[105] *CLP Toxicology, Inc. v Casla Bio Hldgs. LLC*, 2021 WL 2588905, at *9 (Del. Ch. June 14, 2021) (citing *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396 (Del. 2010)).

[106] 817 A.2d 149 (Del. 2002).

18

When the arbitrability of a claim is disputed, the court is faced with two issues. First, the court must determine whether the arbitration clause is broad or narrow in scope. Second, the court must apply the relevant scope of the provision to the asserted legal claim to determine whether the claim falls within the scope of the contractual provisions that require arbitration. If the court is evaluating a narrow arbitration clause, it will ask if the cause of action pursued in court directly relates to a right in the contract. If the arbitration clause is broad in scope, the court will defer to arbitration on any issues that touch on contract rights or contract performance.[107]

Courts differentiate between substantive and procedural arbitrability.[108] Substantive arbitrability refers to "gateway questions about the scope of an arbitration provision and its applicability to a given dispute" and is presumed to be decided by a court.[109] "When examining substantive arbitrability, the underlying question is 'whether the parties decided in the contract to submit a particular dispute to arbitration.'"[110] Procedural arbitrability "concerns 'whether the parties have complied with the terms of an arbitration provision'"[111] including "'whether prerequisites such as time limits, notice, laches, estoppel, and other conditions

---

[107] *Id.* at 155. *See also Legend Nat'l Gas II Hldgs., LP v. Hargis*, 2012 WL 4481303, at *4 (Del. Ch. Sept. 28, 2012) (citing *McLaughlin v. McCann*, 942 A.2d 616, 620–21 (Del. Ch. 2008)) ("In considering a motion to compel arbitration, a court must consider: (1) whether the issue of arbitrability should be decided by the court or the arbitrator; and if by the court, (2) whether the claims should be resolved in arbitration (the issue of arbitrability).").

[108] *See, e.g.*, *Hargis*, 2012 WL 4481303, at *4 (citing *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 80 (Del. 2006)).

[109] *Willie Gary*, 906 A.2d at 79.

[110] *Hargis*, 2012 WL 4481303, at *4 (quoting *Julian v. Julian*, 2009 WL 2937121, at *4 (Del. Ch. Sept. 9, 2009)).

[111] *Gandhi-Kapoor*, 307 A.3d at 349 (quoting *Viacom Int'l, Inc. v. Winshall*, 72 A.3d 78, 82 (Del. 2013)) (cleaned up).

precedent to an obligation to arbitrate have been met.'"[112]  Issues of procedural arbitrability are decided by an arbitrator.[113]  To overcome the presumption of a court deciding substantive arbitrability, there must be "clear and unmistakable evidence" that the parties agreed to do so.[114]

The parties' arguments focus primarily on two cases from the Court of Chancery regarding arbitration provisions, *CLP Toxicology, Inc. v. Casla Bio Holdings LLC*[115] and *Darling Ingredients Inc. v. Smith.*[116]

In *CLP Toxicology, Inc. v. Casla Bio Holdings, LLC,*[117] the Court of Chancery dealt with claims for breach of a purchase agreement wherein the parties contracted to a dispute resolution process if the parties disagreed on the Closing Net Working Capital Amount.[118]  After review of a party's Dispute Notice, if the parties were unable to resolve the conflict, the agreement provided that "either party shall have the right to refer such disputes to the Designated Accounting Firm."[119]  The parties proceeded to the independent accounting firm where sellers raised several arguments that buyers noted were not raised in the Dispute Notice.[120]  The independent

---

[112] *Id.* (quoting *Viacom*, 72 A.3d at 82).
[113] *See id.* (citing *Fairstead Cap. Mgmt. LLC v. Blodgett*, 288 A.3d 729, 751 (Del. Ch. 2023)).
[114] *Hargis*, 2012 WL 4481303, at *4 (quoting *Willie Gary*, 906 A.2d at 79).
[115] 2021 WL 2588905 (Del. Ch. June 14, 2021).
[116] 2023 WL 8533204 (Del. Ch. Dec. 11, 2023).
[117] 2021 WL 2588905 (Del. Ch. June 14, 2021).
[118] *Id.* at *3.
[119] *Id.* (internal citation omitted).
[120] *Id.* at *5.

accountant declined to rule on an issue both because it was not raised in the Dispute Notice and because "[a]dditional disputes arising from or pertaining to adherence to the SPA, or lack thereof (*i.e.*, providing reasonable access to documents, etc.) likely requires a legal interpretation which would have to be addressed outside of this dispute process."[121]

When noting the differences between substantive and procedural arbitrability, *CLP Toxicology* emphasized that "[t]he only question a court should decide is whether the subject matter in dispute falls within an arbitration provision."[122] The court declined to consider whether breaching the contract by "divert[ing] funds away from ABS and avoid[ing] meeting the Gross Profit required to trigger the Contingent Payments" because those issues were clearly "unresolved disputes that arise in the process of the calculation and payment of the Contingent Payments"—a determination reserved for the arbitrator.[123] The court further declined the defendants' argument that "they were relieved of their obligation to issue a Dispute Notice due to the doctrine of futility" because even if futile, "the subject matter of the issue . . . still falls within" the arbitration provision "and as such, is an issue of

---

[121] *Id.* (internal citation omitted). "An assessment of this nature is outside the bounds of my engagement as an Arbitrator at the Designated Accounting Firm." *Id.* (internal citation omitted).
[122] *Id.* at *9. "If the subject matter to be arbitrated is the calculation of an earn-out, or the amount of working capital, or the company's net worth at closing, then all issues as to what financial or other information should be considered in performing those calculations are to be decided by the arbitrator." *Id.*
[123] *Id.* at *10.

procedural arbitrability left for an arbitrator to decide."[124]   In contrast, the court found that the contractual obligation to provide books and records was not within the arbitration provision and "the subject matter of the dispute is a gateway question relating to the scope of an arbitration provision."[125]

*Darling Ingredients Inc. v. Smith*[126] likewise dealt with a dispute resolution process set out in a stock purchase agreement.[127]   When a dispute arose between sellers and buyers over a tax benefit calculation, the sellers had 30 days under the agreement to issue a protest notice challenging the calculation.[128]   "Although the stock purchase agreement permitted the sellers to send Darling an information request and toll the 30-day deadline, the sellers instead sent Darling a formal protest notice" launching the contractual dispute resolution process.[129]   The accountant gave

---

[124] *Id.*

[125] *Id.* at *10–11.   "Looking at the Agreement's language itself (aided by Grant Thornton's arbitration determination), it's clear that the question of whether CLP failed to grant reasonable access to ABS's books and records doesn't fall within any arbitration provision.   Because the parties did not contractually agree to arbitrate disputes related to reasonable access to books and records, arbitration provides no adequate legal remedy."   *Id.* at *11.   The section detailing the Calculation of the Gross Profit included the requirement that

> From and after the delivery of the 2018 Audited Financials, Buyer and the Company shall provide the Company Seller and any Representatives, accountants or advisors retained by the Company Seller with reasonable access to the books and records of the Group Companies for the purpose of enabling the Company Seller and its accountants and advisors to calculate, and to review Buyer's calculation and preparation of Gross Profit as set forth on the 2018 Audited Financials and the aggregate Contingent Payment payable to Sellers in connection therewith (if any).

*Id.* at *2.

[126] 2023 WL 8533204 (Del. Ch. Dec. 11, 2023).

[127] *Id.* at *1.

[128] *Id.*

[129] *Id.*

22

the parties an engagement letter "confining the scope of its work to the issues it raised in the sellers' protest notice."[130] The sellers were unwilling to sign the engagement letter until the accountant added issues that sellers put forth in a second dispute notice.[131] The accountant declined to interpret how the contract defined its role.[132] The parties requested the accountant to "resolve as a prefatory issue the scope of what [the accountant] may consider under the Agreement in resolving the dispute and provide that scope determination to the parties."[133] The accountant refused stating that the parties were asking for a legal determination outside the accountant's scope.[134]

On cross-motions for summary judgment, the Court of Chancery interpreted the dispute resolution provision as limiting sellers to filing one Protest Notice, not multiple, nor amended notices.[135] The court also noted that sellers did not invoke their right to toll and request pre-protest information, instead filing the protest notice was a choice and "[a]lthough the Sellers might now regret their hasty choice, the

---

[130] *Id.*

[131] *Id.*

[132] *Id.* The agreement stated that the accountant's review "must be 'based solely on the [Closing Tax Benefit Amount] and Protest Notice, together with all relevant supporting documentation, and any other clarifying presentations and submissions by [Darling] and Sellers' Representative as [Deloitte] may reasonably request[.]'" *Id.* at *4.

[133] *Id.* at *7.

[134] *Id.*

[135] *Id.* at *9. The provision of the agreement states that "[w]ithin thirty (30) days following delivery of the [Closing Tax Benefit Amount], [Sellers] may deliver written notice (the 'Protest Notice') to [Darling] of any disagreement that Sellers [] . . . may have as to the [Closing Tax Benefit Amount]." *Id.*

Agreement does not grant them a protest notice do-over."[136] The court therefore held that the accountant's engagement letter was accurate as per the interpretation of the agreement, and sellers were obligated to comply with the dispute resolution process without their subsequent notice claim or additional issues considered.[137]

### 3. Overview of the SPA Arbitration Provision

The SPA's Section 2.4 deals with the "Purchase Price Adjustment."[138] Pursuant to Section 2.4, Buyer was required to prepare and deliver a "Closing Date Statement" "together with reasonably detailed supporting documentation, setting forth in reasonable detail Buyer's good faith calculation[s]."[139] The SPA delineates a dispute resolution provision for any disputes arising from the calculation of the Closing Date Statement.[140] Upon receipt of the Closing Date Statement, Seller has thirty days to object to any of Buyer's included calculations by delivering to Buyer

> [A] written notice (a "Dispute Notice") describing in reasonable detail Seller's objections to Buyer's calculation of the amounts set forth in such Closing Date Statement and containing a statement setting forth the calculation of the amount of Closing Net Working Capital, Closing Company Cash, Closing Company Indebtedness, and Company Transaction Expenses, or the resulting calculation of the Purchase

---

[136] *Id.* at *12. "The Sellers' remorse over the November Protest Notice they cast does not allow them to unilaterally expand the universe of what Deloitte may consider." *Id.*

[137] *Id.* at *13.

[138] SPA at 18–22.

[139] *Id.* § 2.4(b). The calculations consisted of the "(i) Closing Net Working Capital and the resulting Working Capital Increase or Working Capital Decrease, as the case may be, (ii) the amount of each of (A) Closing Company Cash, (B) Closing Company Indebtedness and (C) Closing Company Transaction Expenses, and (iii) using the amounts in the foregoing clauses (i) and (ii), the resulting calculation of the Purchase Price under Section 2.3(a)." *Id.* (emphasis in original).

[140] *Id.* § 2.4(c).

Price, in each case determined by Seller to be correct, as well as any relevant supporting documentation.[141]

Anything Seller does not object to in the Dispute Notice will "be deemed to have [been] agreed with" and "such calculations shall be binding and conclusive on the Parties and shall not be subject to review in accordance with Section 2.4(c)(ii)."[142] The parties then had have thirty (30) days after a valid Dispute Notice is filed to resolve their issues "in good faith" otherwise "Buyer and Seller shall jointly engage the firm of Marcum LLP (the 'Arbitration Firm') to resolve such dispute."[143] The SPA provided:

> [The] Arbitration Firm's role shall be limited to resolving such objections and determining the correct calculations to be used on only the disputed portions of the Closing Date Statement as set forth in the Dispute Notice . . . and the Arbitration Firm shall not make any other determination, including any determination as to whether any other items on the Closing Date Statement are correct, whether the Target Net Working Capital Range is correct, and with respect to the timeliness of delivery or receipt of any Dispute Notice.[144]

The written determinations of the Arbitration Firm are "conclusive and binding on the Parties, absent manifest error."[145] Finally, Section 2.4 (d)(iv) states "Buyer agrees that the adjustments to the Estimated Purchase Price and the dispute

---

[141] *Id.* § 2.4(c)(i) (emphasis in original).
[142] *Id.* (emphasis in original).
[143] *Id.* § 2.4(c)(ii) (emphasis in original).
[144] *Id.*
[145] *Id.*

25

resolution provision provided for in Section 2.4(c) shall be the exclusive remedies for the matters addressed herein."[146]

### 4. The Court Lacks Subject Matter Jurisdiction over Counts I, II, III, IV and VI.

Delaware respects valid arbitration provisions. Neither party argues the arbitration provision here is invalid; rather, the parties dispute whether the valid arbitration provision encompasses the claims at issue. The parties also do not dispute that the arbitration clause is the "exclusive remedy" for those issues encompassed by Section 2.4. Seller only disputes that Seller's claims are fully encompassed by that Section. The Court, therefore, need not analyze whether the provision is mandatory or permissive:[147] Section 2.4 is unambiguously mandatory.

The Court agrees with Seller's argument that the arbitration clause is "narrow" as opposed to "broad."[148] A broad provision uses language such as "any dispute controversy, or claim arising out of or in connection with" the contract at issue.[149] A narrow provision limits arbitration to "specific types of disputes."[150] Buyer disputes that the provision is narrow in its brief,[151] but concedes the provision is

---

[146] *Id.* § 2.4(d)(iv).
[147] *See, e.g.*, *Maloney-Refaie v. Bridge at Sch., Inc.*, 958 A.2d 871, 885 (Del. Ch. 2008) (analyzing whether an arbitration clause was mandatory or permissive).
[148] Pl.'s Opp'n at 16–17.
[149] *See, e.g.*, *Parfi*, 817 A.2d at 155.
[150] *Specialty Dx Hldgs., LLC v. Lab'y Corp. of Am. Hldgs.*, 2020 WL 5088077, at *6 (Del. Super. Jan. 31, 2020) (citing *Lockwood Bros, II*, 2020 WL 2836404, at *6)).
[151] Def.'s Reply at 4–5.

limited to issues arising only from Section 2.4, rather than the entire SPA.[152]

Although the exact narrow-ness of the provision need not be determined, the Court is satisfied the provision is limited to those issues within Section 2.4 of the SPA. While the Court does not agree that such a distinction does not "matter" as Buyer characterizes it,[153] the Court does agree that the fact that the clause is narrow does not end the analysis. The issue for the Court is to determine the scope of Section 2.4 and whether the subject matter of the claims fall within that "narrow" scope.[154]

The Court does not find Seller's argument as to interpreting the phrase "calculation of" persuasive. Seller's assertion that the words "calculation of" "signifies that the scope of arbitrable matters is limited to those in which the parties both have access to the same source data and merely differ as to their use of that source data to calculate Closing Net Working Capital or other salient values"[155] is too much of a stretch. Seller provides no support for such an extrapolation beyond a vague case citation that courts assume no language is superfluous.[156] This

---

[152] *See, e.g.*, *Channel PES Acq. Co.*, C.A. No. N23C-08-206 MAA CCLD, at 55:5–20 (Del. Super. Mar. 28, 2024) (TRANSCRIPT).

[153] Def.'s Reply at 4–5 ("Although [Buyer] disagrees with this analysis, it's not clear why this characterization matters.").

[154] *Viacom*, 72 A.3d at 83 ("Once it is determined that the parties are obligated to submit the subject matter of a dispute to arbitration, 'procedural' questions that grow out of the dispute and bear on its final disposition should be left to the arbitrator.") (internal citation and quotation omitted). The Court consequently is unpersuaded by Seller's assertion that upholding the arbitration provision could unjustly sanction fraud. The arbitration provision is "narrow" and thus is limited to causes of action encompassed within; fraudulent conduct is distinct and thus not sanctioned by the Court upholding a bargained for arbitration provision the parties contracted.

[155] Pl.'s Opp'n at 18.

[156] *Id.* (citing *NAMA Hldgs.*, 948 A.2d at 419).

27

conclusion, while true, does not permit a party to read more into a contract than the parties mutually bargained for. Such an interpretation is also not supported by the other language in Section 2.4(c), which includes requirements relating to Buyer providing documentation to Sellers and for the parties to "reasonably cooperate[.]"[157] Reading the language "calculation of" as limited to only that which the two parties have the same information is not supported by a plain reading of the contract.

Buyer's reliance on *Darling* is similarly unpersuasive. Unlike *Darling*, the parties here did not have a separate tolling provision in which Seller could opt into to seek additional information. *Darling* bound the sellers in that case to their dispute notice because they opted to file the notice instead of otherwise filing an information request to toll their dispute notice deadline.[158] The parties here do not sufficiently argue Seller had an alternative to filing the Dispute Notice. At oral argument, Buyer suggested "Seller could have said, you know, we don't have to go to arbitration, we're not bound by this provision."[159]

The Court finds that *CLP Toxicology* is more closely aligned with this action. *CLP Toxicology* distinguished between issues related to the calculation itself,

---

[157] SPA § 2.4(c)(i).
[158] *Darling*, 2023 WL 8533204, at *8–9.
[159] *Channel PES Acq. Co.*, C.A. No. N23C-08-206 MAA CCLD, at 54:14–19 (Del. Super. Mar. 28, 2024) (TRANSCRIPT).

including how the buyers allegedly diverted funds such that less would be owed to sellers, from those related to books and records obligations. The dispute resolution provisions are very similar between this case and *CLP Toxicology*, where both the process of calculating the final amounts is delineated, as well as requirements to turn over books and records so that the reviewing party can make an informed decision on a dispute.[160]

The Court agrees with *CLP Toxicology* that disputes relating to diverting funds were "clearly" within the "process of calculation and payment." Here too, the act of issuing credits as part of buyer's conduct, and including those credits in its calculations, are within the purview of the arbitrator to consider.

This leaves the Court with reviewing Count I regarding books and records. *CLP Toxicology* did not deem the obligation to turn over books and records as within the scope of the arbitration provision, despite the section explicitly detailing buyer's obligations to do so.[161] Here, although the provisions in *CLP Toxicology* and this action are similar, the actions of the two arbitrators (and the parties) regarding the books and records issue compel a different result. In particular, the Court turns to the Engagement Letter[162] and the parties' submissions. The Engagement letter states

---

[160] *Compare CLP Toxicology*, 2021 WL 2588905, at *2–3 (outlining the agreement's dispute resolution provisions), *with* SPA § 2.4(c).
[161] *CLP Toxicology*, 2021 WL 2588905, at *10–11.
[162] Def.'s Br., Ex. 4.

that the Arbitration Firm[163] would make an initial determination regarding "the final list of Disputed Items (and amounts thereof) that are subject to resolution by the Arbitrator pursuant to Section 2.4(c) of the Agreement, *and which (or whether) additional documents should be produced*."[164]  This alone could end the inquiry about whether the Arbitration Firm had the authority to evaluate Seller's access to books and records.

Nonetheless, the Court's review of the First and Second Determination Letters demonstrate that the Arbitrator analyzed the arbitration provision and the terms of the SPA to determine the issues that were properly disputed and what was (or was not) within his power.[165] Included in the Arbitrator's analysis was an analysis of Seller's nine outstanding document requests for which it sought the production of documents.[166]  In the First Determination Letter, the Arbitrator ordered Buyer to produce documents in response to six of the nine requests.[167]  Then, on October 10, 2023, the Arbitrator provided his interrogatories and documents requests to the Parties.[168]  On November 3, 2023, the Arbitrator issued supplemental interrogatories and document requests.[169]  The parties submitted their responses on November 17,

---

[163] *Id.* at 1 (defining Richard Lee as the "Arbitrator" of AlixPartners, the "Arbitration Firm").
[164] *Id.* sched. 1.  (emphasis added).
[165] Def's. Br., Exs. 5, 10.
[166] Def's Br., Ex. 5 at 5–8.
[167] Def.'s Br. Ex. 5.
[168] *Id.*, Ex. 10.
[169] *Id.*, Ex. 11.

2023 and produced documents.[170]  The Arbitrator issued a Determination Letter on December 22, 2023.[171]  The Arbitrator's and the parties' conduct here compels one result: Count I falls squarely within Section 2.4.[172]

The Court therefore deems Count I, II, III, IV, and Count VI as issues of procedural arbitrability, encompassed within the scope of the arbitration provision. As such, they are all matters for the Arbitrator to decide.  The Court therefore dismisses Counts I, II, III, IV, and VI for lack of subject matter jurisdiction.

**B.  MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM FOR BREACH OF CONTRACT AS TO COUNT V.[173]**

### 1.  The Parties' Contentions

As to Count V, Buyer indicates "it is not clear whether [Seller] is alleging that Buyer breached the SPA or the Escrow Agreement" nor what terms of either agreement were breached.[174]  Buyer also notes that Buyer served a valid Claim

---

[170] Def's Br. at 12–13.
[171] Pl.'s Opp'n, Ex. 1.  The Arbitrator concluded that:
> My Final Determination described above is 50.82% in favor of Seller and 49.18% in favor of Buyer.  The total fees of the Accounting Expert are $421,721, half of which has been invoiced to and paid by each Party.  The allocation of the fees and expenses based on the terms of the SPA is $207,394 to be borne by Seller ($421,721 x 49.18%) and $214,327 to be borne by the Buyer ($421,721 x 50.82%).

*Id.* at 26.
[172] The Court notes that *Chambers Belt Co. v. Tandy Brands Accessories, Inc.*, 2012 WL 3104396 (Del. Super. July 31, 2012), relied upon by Seller, does not apply here.  In *Chambers Belt* did not review issues of procedural or substantive arbitrability.  Rather, in Chambers belt, the court determined whether "a Court of Chancery decision in a prior proceeding between Chambers and Defendant Tandy Brands Accessories, Inc….concerning the same contract dispute at issue[] here[] should be accorded *res judicata* or collateral estoppel effect."  *Id.* at *1.
[173] Buyer also sought to dismiss Counts I, II, III, IV, and VI for failure to state a claim.  The Court declines to address the substance of these arguments for lack of subject matter jurisdiction.
[174] Def.'s Br. at 29.

31

Notice in compliance with the SPA which has not been resolved, proving Count V is unfounded.[175]

Seller argues Count V is sufficient because "the First Amended Complaint states that Buyer does not (and could not) have a basis to withhold the funds that Seller deposited for the representation-and-warranty escrow pursuant to the Escrow Agreement because the underlying representations and warranties expired prior to Buyer asserting any compliant claim."[176] Seller further asserts that any consideration of the merits of the underlying claim is not appropriate at the motion to dismiss stage.[177]

Buyer responds that Seller's Opposition fails to explain the *facts* Seller relies on, instead, Seller only asserts *conclusions*.[178] As to the merits of the Claim Notice, Buyer notes that Seller "has not pleaded *any facts* regarding its response to the Claim Notice—because there was no response—or regarding [Seller]'s compliance with Article VIII of the SPA's clearly delineated process by which objection to Claim Notices must be made and resolved—because [Seller] did not comply with Article VIII."[179]

---

[175] *Id.* at 29–30.
[176] Pl.'s Opp'n at 27.
[177] *Id.* at 27–28.
[178] Def.'s Reply at 15.
[179] *Id.* at 17–18 (emphasis in original).

## 2. The Law

The pleading standards on a motion to dismiss are minimal.[180] "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[181] All that is required is that the complaint "alleges that it provided adequate notice to [defendant] and that [plaintiff's] claim, if proven, would entitled [plaintiff] to relief under a reasonably conceivable set of circumstances."[182] To survive a breach of contract claim, the plaintiff "must allege: (1) the existence of a contract; (2) that the contract was breached; and (3) damages suffered as a result of the breach."[183] "In other words, '[d]ismissal is proper only if the defendant['s] interpretation is the *only* reasonable construction as a matter of law.'"[184] For the following reasons, the Court deems the breach of contract claim is sufficiently pled.

Seller's Count V asserts Buyer "breached the SPA by refusing to release the representations-and-warranties escrow notwithstanding the lack of any proper claim notice as required to continue to maintain the representations-and-warranties escrow."[185] Seller here has not specifically alleged what provision of the SPA, or

---

[180] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011) (citing *Savor*, 812 A.2d at 896).
[181] *Id.* at 537 (internal citations omitted).
[182] *Id.* at 538.
[183] *Khushaim v. Tullow Inc.*, 2016 WL 3594752, at *3 (Del. Super. June 27, 2016) (citing *eCommerce Indus., Inc. v. MWA Intel., Inc.*, 2013 WL 5621678, at *13 (Del. Ch. Sept. 30, 2013)).
[184] *Id.* (quoting *Vanderbilt Income & Growth Assocs.*, 691 A.2d at 613) (emphasis in original).
[185] Am. Compl. ¶¶ 118–120.

the Escrow Agreement, Buyer is alleged to have breached. Seller also fails to explain why the claim notice was improper.

The Court acknowledges these allegations are vague, but nonetheless will allow the claim to proceed at this stage noting its skepticism. Buyer asks the Court to "simply take note" of the Claim Notice to indicate that Seller's allegation should fail *because* there is a valid claim notice.[186] The Court agrees the Claim Notice is fairly incorporated into the Complaint by reference, but the existence of the Notice does not alone preclude Seller's claim since Seller alleges that the notice was not "proper."[187] Buyer's request that the Court determine the existence of the Claim Notice "which was served within twelve months after Closing and set forth in reasonable detail a Third Party Claim"[188] is not enough to overcome the minimal pleading standard Seller has.[189] Seller *could* have pled more detail as to how the Claim Notice was improper, but is not required to. At this stage, it is "reasonably conceivable" that Seller could prove the Notice Claim was improper and thus failed to satisfy the Escrow Agreement, therefore, the Court declines to dismiss the claim at this point.

---

[186] Def.'s Reply at 17–18.
[187] Am. Compl. ¶ 119.
[188] Def.'s Reply at 18.
[189] *See Channel PES Acq. Co.*, C.A. No. N23C-08-206 MAA CCLD, at 39:10–19 (Del. Super. Mar. 28, 2024) (TRANSCRIPT) (stating the claim notice was insufficient because "the original notice failed to provide any actual notice of any valid basis for any claim for indemnification, it didn't include any supporting details as to what the basis, the underlying liability might have been such that indemnification would be required").

## VI.   CONCLUSION

In conclusion, Buyer's motion to dismiss is **GRANTED** as to Counts I, II, III, IV, and VI for lack of subject matter jurisdiction, and **DENIED** as to Count V because Seller has sufficiently stated a claim for breach of contract.

**IT IS SO ORDERED.**

/s/ Meghan A. Adams

**Meghan A. Adams, Judge**